**Hugh JOSEPH, Administrator of the Estate of Mark Joseph, a/k/a Larry Jones, Plaintiff-Appellant,**

v.

**David BRIERTON, Warden, Stateville Correctional Center, et al., Defendants-Appellees.**

No. 83–2033.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1984.

Decided July 23, 1984.

As Corrected Aug. 3, 1984.

Rehearing and Rehearing En Banc Denied Nov. 7, 1984.

Patrick T. Murphy, Ltd., Chicago, Ill., for plaintiff-appellant.

Steven F. Molo, Timothy J. Touhy, Leslie Rosen, Asst. Attys. Gen., Chicago, Ill., for defendants-appellees.

Before PELL and POSNER, Circuit Judges, and WEIGEL, Senior District Judge.*

POSNER, Circuit Judge.

This is a suit for damages under 42 U.S.C. § 1983. It was brought by the administrator of the estate of a prisoner who died while in the hospital unit of Illinois' Stateville prison, against the warden and other officials of Stateville, charging that the prisoner (the plaintiff's son) suffered and died as a result of the inhumane conditions and inadequate medical care in the unit. The defendants won a jury verdict, and the plaintiff has appealed.

Mark Joseph, age 18, was in another prison in the state system when on December 2, 1975, he suffered a mental breakdown and was transferred to the hospital unit at Stateville. There he behaved in an increasingly bizarre fashion. He seems to have wedged himself against the radiator in his cell, and sustained second- and third-degree burns. He kept tearing off his clothes and racing about uncontrollably. He spread his own feces all over his cell and on his body, hair, and mouth, shouting all the while that he was Moses and Christ, and the son of Abraham Lincoln. After a week of such carryings on he suddenly collapsed, and was dead within minutes of cardiac arrest apparently induced by acute psychosis. The prison phoned his father and told him that Mark had committed suicide, and a confirmatory telegram was sent the next day; but the defendants admit that Mark did not commit suicide.

Although it is admitted that one of the guards punched Mark in the face in the course of his wild careenings, and although the plaintiff suggests that someone, perhaps even a guard, may have held Mark against the radiator, it is really not the plaintiff's theory of the case that Mark was the victim of intentional misconduct. The theory is that the defendants exhibited a willful indifference to his welfare by allowing him to live in bestial conditions for the week before his death and by neglecting an obviously serious mental illness, thus causing or hastening his death.

■■■ Although medical (including psychiatric) malpractice is not actionable under section 1983 as a form of cruel and unusual punishment, willful neglect is, see *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), and it was a jury question whether the defendants' conduct, which was certainly neglectful, was so far neglectful as to be willful. See *Wood v. Worachek*, 618 F.2d 1225, 1233 (7th Cir.1980). But the plaintiff argues that he did not have a fair chance with the jury, because of errors in the trial.

The most serious error alleged grows out of remarks made by the defendants' lawyer, an assistant state attorney general, in his closing argument to the jury. By way of background it should be noted that the defendants were very concerned to keep from the jury the fact that the State of Illinois indemnifies its employees for any judgments entered against them in suits growing out of their employment. The defendants' counsel therefore asked the judge before the trial began to order the plaintiff's counsel not to mention that the defendants would be indemnified if they lost. The judge granted the motion, even forbidding the plaintiff's counsel to identify the defendants' counsel (or co-counsel) as a member of the attorney general's staff. Yet in the closing argument, the defendants' counsel, with a passion that fairly breathes through the transcript, made much of the financial impact that a judgment against the defendants would have on them. He told the jury that a verdict for the plaintiff would send the following message to correctional officers all over the United States: "We are going to hire you. We are going to give you staff; not enough. We are going to give you medical help; not enough. We can't afford it. We are going to give you a limited budget. Do what you can with it. We know it's not the best. We don't have enough money. But when something goes wrong, you are responsible, don't look to us. That is the message that they will get. And when you

* Hon. Stanley A. Weigel of the Northern District    of California, sitting by designation.

give them that message, you won't have psychiatrists, you won't have nurses .... We can go back to the eighteenth century and lock that door and leave those people ...." He adjured them not to render a compromise verdict. "If you do that, that will be a terrible, terrible injustice. You will have destroyed these men, because when you go into the jury room you are taking in there, their good names, their reputations, their careers." He described his adversary's position as, "Let's saddle these five men [the defendants] with $1.8 million [the amount that the plaintiff had asked for in the complaint]." He said: "the average working man makes about $24,000 a year. Let's keep this in perspective. Now that might be a little high. But the average working man who makes $24,000 a year would have to work for the next 75 years to earn the amount of money that Mr. Murphy [the plaintiff's counsel] is asking you to saddle these people with.... [T]his individual, this mythical working man, would have to work for 750 years to earn the amount of money that he is asking to make these people responsible for." He added: "Now although I don't think that these individuals should be required to pay anything, because they didn't do anything wrong, it is my duty as their attorney to speak to the issue of damages. I would like you to remember that when you go into the jury room, as to what is fair. $1.8 million. Mark Joseph was a convicted felon by the time he was eighteen years old. He had no income. He didn't support anyone. Mr. Murphy wants you to saddle these individuals with $1.8 million. That's not fair."

■ The plaintiff's counsel did not object to these remarks when made; if he had done so, he would (as the district judge later noted) have been violating the order forbidding him to mention that the defendants would be indemnified if they lost the case. In addition, an objection would have highlighted this part of the defendants' closing argument in the jurors' minds. *Werner v. Upjohn Co.,* 628 F.2d 848, 854 (4th Cir.1980). Counsel was therefore entitled to postpone his objection to the end of

the closing arguments, see *Lange v. Schultz,* 627 F.2d 122, 127 (8th Cir.1980), as he did; and in response the judge proposed to add the following instruction, and did: "If you decide on liability in this case and therefore turn to the question of damages, do not concern yourself with the defendants' ability to pay. If there is a judgment that problem will be addressed later. A judgment, if any, should reflect your decision as to the appropriate amount of damages to be awarded to the plaintiff, Mr. Hugh Joseph as administrator of his son's estate and that's all."

But the curative instruction was, as the plaintiff's counsel complained to the judge, inadequate even if not understood literally. (Read literally it requires the jurors to disregard the defendants' ability to pay when they calculate damages but not necessarily when they decide whether the defendants are liable.) Telling a jury not to think about something may simply rivet the jurors' attention to it. Nevertheless this type of instruction is given all the time, and sometimes, we imagine, it works—not because it literally makes the jury forget something it has heard, but because a conscientious jury, like a conscientious judge, will try not to be influenced by something that it knows is extraneous to its responsibilities, and will sometimes succeed. But the efficacy of such an instruction is always uncertain, and where the misconduct giving rise to it is as serious as it was in this case stronger medicine may be needed.

■ In his closing argument the defendants' counsel insinuated to the jury that a large judgment would ruin his clients, though he knew it would not cost them a cent. He thus was taking improper advantage of the order he himself had procured forbidding the plaintiff's counsel to put before the jury the true financial consequences of a judgment—an order that the plaintiff's counsel scrupulously obeyed. The defendants' counsel was an officer of the state, acting in his official capacity to represent public employees for whose torts the state was financially responsible. His

conduct would not have been proper if he had been a private attorney representing private clients; but it was even worse for a state officer to act in this way. The ethics of the public's lawyers should be above reproach. Cf. ABA Model Code of Professional Responsibility, Ethical Consideration No. 7–14 (1981). Most important—since the issue before us is not whether to punish counsel for his misconduct but whether to reverse the judgment in favor of his clients—counsel's remarks were not only false but also highly prejudicial in both content and wording. In these circumstances the district judge was required to do more than he did: either to grant a mistrial or to let the jury know that the defendants were indemnified. See *Harbin v. Interlake Steamship Co.*, 570 F.2d 99, 106 (6th Cir.1978).

Naturally, in reviewing questions concerning remarks alleged to have misled the jury, we give great weight to the district judge's judgment. See *Draper v. Airco, Inc.*, 580 F.2d 91, 94 (3d Cir.1978). He heard the remarks, could place them in the context of the entire trial, and watched the jury as it listened to them. But we must reverse if we disagree strongly with the district judge's evaluation, especially where, as happened here, the judge expressed concern with the impact of the remarks on the jury and therefore gave a curative instruction—but a curative instruction that we are convinced could not have cured. Cf. *Klotz v. Sears, Roebuck & Co.*, 267 F.2d 53, 55 (7th Cir.1959). We gather from the transcript of the trial that the plaintiff's counsel, too, overstepped the proper bounds of trial conduct at times, and that the judge, understandably, became irritated with him. But the misbehavior of the plaintiff's counsel was not of the same magnitude as that of the defendants' counsel and did not justify the judge in not taking stronger action to protect the plaintiff's right to a fair trial.

To minimize the chance of error at the retrial, we shall go on and discuss the other two errors that the plaintiff alleges. First, the judge ad libbed an instruction to the jury that had not been offered by counsel, or discussed at the instructions conference, or even mentioned to counsel before the jury was instructed. The ad libbed instruction was: "The plaintiffs are not charging the defendants in this case with causing the death of Mark [Joseph]—the plaintiffs are charging that the treatment of [him] and the circumstances of his confinement violated his civil and constitutional rights." This instruction apparently was intended to mean, and can be interpreted to mean, that the plaintiff did not have to prove that the defendants had caused Mark Joseph's death; their willful neglect, if such it was, would be actionable even if he had died of unrelated causes, though his damages would in that event be less. But the jurors were more likely to understand the instruction to mean that the plaintiff was no longer contending that the defendants had caused his son's death—and if they thought this they probably concluded that the plaintiff must have a very weak case.

Although the plaintiff's counsel did not object to this instruction or request a supplementary one, he explains that he did not realize till too late that the judge had added to the instructions that had been discussed with counsel. In these special circumstances we do not think that Rule 51 of the Federal Rules of Civil Procedure, which provides in relevant part that "No party may assign as error the giving ... [of] an instruction unless he objects thereto before the jury retires to consider its verdict," bars a challenge to the instruction on this appeal, or makes the instruction the law of the case for the next trial, even though the plaintiff first objected in moving for a new trial. As is clear from the preceding sentence in the rule ("The court shall inform counsel of its proposed action upon the requests [for particular instructions] prior to their arguments to the jury ..."), the usual setting in which the bar of Rule 51 is invoked is where counsel failed to object to an instruction at the instruction conference. Counsel here was surprised by the district judge's action in adding an instruction after the conference; and in these circumstances, as is clear from our

decision in *Hetzel v. Jewel Cos., Inc.*, 457 F.2d 527, 535 (7th Cir.1972), which in this respect survives its overruling in *United States v. Hollinger*, 553 F.2d 535, 541–43 (7th Cir.1977), the bar of Rule 51 is inapplicable. See also *Estate of Lutren v. Chesapeake & Ohio R.R.*, 592 F.2d 941, 944–46 (6th Cir.1979); *Wylie v. Ford Motor Co.*, 536 F.2d 306, 308 (10th Cir.1976).

We are well aware that there is no counterpart in the civil rules to Rule 52(b) of the criminal rules, which allows the court of appeals to correct plain errors not raised in the district court, and that this circuit has been reluctant to recognize one, see *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 549 (7th Cir.1982). But the issue here is not the plain-error doctrine. Rule 51 presupposes that counsel had a reasonable opportunity to object to the instructions before they were given; and where, as in this case, counsel did not have such an opportunity, he is not within the bar of Rule 51. His objection to the instruction was timely.

We do not mean that it was improper for the district judge to depart from the instructions decided on in conference. The purpose of jury instructions is to communicate, and communication is more effective when it has some spontaneity—any lecture goer knows how deadly it can be to listen to someone reading a text word for word. But the purpose of orally paraphrasing written instructions is to lend spontaneity and enhance understanding, not to change substantive directions as may inadvertently have happened here. And since most judges today do just read the instructions to the jury, when a judge wants to give himself the freedom to ad lib (a freedom that we have said is properly used to clarify, not to alter, the written instructions to which counsel have had a full opportunity to object at the instruction conference) he must tell the lawyers in advance what he is doing so that they will attend carefully, and he must give them a reasonable interval after he has completed instructing the jury, and before it retires, to propose curative or suppletive instructions.

The last error alleged concerns the judge's instruction "that public officials enjoy good faith immunity from liability. That is, are not liable if they acted in good faith in civil rights cases such as this." He added, however, that a defendant would not be immune "if he knew or reasonably should have known that the actions he took would violate the constitutional or civil rights of the plaintiff or, if he acted with a malicious intent to violate the rights of the plaintiff." The plaintiff argues that after *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the only basis for the qualified or good-faith immunity that defendants such as these are entitled to claim in a civil rights damage action is that the law governing their conduct was unsettled at the time that the conduct occurred, an issue the judge is to decide on the defendants' motion for summary judgment rather than submit to the jury. The Court held in *Harlow* that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.... If the law was clearly established, the immunity defense ordinarily should fail ...." *Id.* at 818–19, 102 S.Ct. at 2738–39. And the determination whether the law was clearly established at the time of the incident giving rise to the suit is for the court, not the jury: so no immunity instruction should be given at all, *McKinley v. Trattles*, 732 F.2d 1320, 1324 (7th Cir.1984); *Czurlanis v. Albanese*, 721 F.2d 98, 108 (3d Cir.1983), except in "extraordinary circumstances," not suggested here, that might prevent the official from knowing the law, *Harlow v. Fitzgerald, supra*, 457 U.S. at 819, 102 S.Ct. at 2739.

Although *Estelle v. Gamble*, the leading case on willful neglect of prisoners' medical needs, was decided the year after Mark Joseph's death, the defendants do not argue that the willful-neglect standard was not clearly established when he died. Nor could they, in view of the citations in *Estelle* to the court of appeals decisions that

had already adopted the deliberate-indifference or wilfull-neglect standard. See 429 U.S. at 106 n. 14, 97 S.Ct. at 292 n. 14. One of the cases cited, *Thomas v. Pate*, 493 F.2d 151, 158 (7th Cir.), vacated and remanded on other grounds, 419 U.S. 813, 95 S.Ct. 288, 42 L.Ed.2d 39 (1974) (per curiam), was a case from this circuit. As the law was, therefore, established, the defendants were not entitled to immunity. The case is within the rule that "prison officials are not entitled to an objective good faith defense [i.e., the defense recognized by *Harlow*] if they are aware of a risk of injury to an inmate and nevertheless fail to take appropriate steps to protect the inmate from that known danger." *Miller v. Solem*, 728 F.2d 1020, 1024 (8th Cir.1984).

The judgment is reversed and the case remanded for a new trial.