**Idris Ibrahim SIDDIQI,
Plaintiff–Appellant,**

v.

**Spencer LEAK,\* in His Official Capacity as Executive Director of the Cook County Department of Corrections, Defendant–Appellee.**

**No. 88–2123.**

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1989.

Decided July 12, 1989.

---

\* Phillip T. Hardiman was Executive Director of      the Cook County Department of Corrections

during the time Siddiqi was in the Cook County Jail. Hardiman resigned that office in November of 1986. In an official capacity suit, if the defendant left office during the course of the suit, the successor in office will be automatically substituted as the defendant. *See* Fed.R. App.P. 43(c)(1); *Kentucky v. Graham,* 473 U.S. 159, 166 n. 11, 105 S.Ct. 3099, n. 11, 87 L.Ed.2d 114 (1985); *Hadi v. Horn,* 830 F.2d 779, 783 (7th Cir.1987); *Duckworth v. Franzen,* 780 F.2d 645, 650 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986).

Elizabeth Dale, Kenneth Flaxman, Kenneth N. Flaxman, P.C., Chicago, Ill., for plaintiff-appellant.

Joseph D. Ryan, Asst. State's Atty., Federal Litigation Unit, Chicago, Ill., for defendant-appellee.

Before WOOD, Jr., COFFEY, and MANION, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

Plaintiff-appellant Idris Ibrahim Siddiqi ("Siddiqi") was confined at the Cook County Jail ("Jail") for four months in 1985. During that time Siddiqi, who is a Muslim, was unable to attend Muslim services in the Jail. Siddiqi filed this lawsuit under 42 U.S.C. § 1983 alleging that Phillip T. Hardiman, then Executive Director of the Cook County Department of Corrections ("Director") denied Siddiqi his free exercise rights under the first amendment, as applied to the states through the fourteenth amendment. At trial, the jury returned a verdict for the Director. The district court then denied Siddiqi's motion for judgment notwithstanding the verdict and this appeal followed.

The district court had jurisdiction under 28 U.S.C. § 1343 over Siddiqi's claim for money damages under 42 U.S.C. § 1983. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Siddiqi asks us to reverse the trial court's entry of judgment for the Director, arguing that the district court incorrectly denied his motion for judgment notwithstanding the verdict. Siddiqi also claims that a new trial is required since the district court did not inform the parties about certain jury instructions prior to closing arguments in violation of Fed.R.Civ.P. 51.

## I.  FACTUAL BACKGROUND

Siddiqi converted to Islam in 1974 while serving time for armed robbery in the Pendleton Reformatory in Indiana. During his time at Pendleton Siddiqi, who changed his name for religious reasons, attended Muslim services and classes at the Reformatory. Siddiqi was next confined in the Terre Haute Federal Penitentiary after being convicted of armed bank robbery. Siddiqi testified that he also attended Muslim services there. After being released from Terre Haute in 1980, Siddiqi worked for the Muslim Student Association for three years, until his arrest and conviction for another armed robbery in Illinois. Siddiqi served time in the Stateville Correctional Center, where he testified that he took part in Muslim religious activities.

Siddiqi's incarceration in the Cook County Jail began when he was accused and convicted of escaping from Stateville. Siddiqi was confined in the Cook County Jail from July 8 through November 1, 1985. Siddiqi served his time in Division One, the high security division of the jail. While incarcerated at Cook County, Siddiqi claims that he was unable to procure the services of a Muslim minister for weekly prayer services, known as Jumu'ah services. Beginning in August, Siddiqi made written and oral complaints to jail authorities asking that Muslim services be made available to him. Siddiqi testified that he was un-

able to attend Jumu'ah services anytime during his stay in the Cook County Jail.

The Cook County Jail accommodates the religious needs of its prisoners through an organization called the Chaplaincy Council ("Council"). In 1979, the Council was created to oversee religious activities in the Jail. The Council is made up of representatives of the religious organizations that were providing religious services to the Jail in 1979. At oral argument, counsel for defendant stated that there were nine Christian groups, one Jewish group, and one Muslim group represented on the Council and each group assigned one of their members to be a representative at Council meetings. The Council is charged with answering inmate requests for religious services and the individuals and groups providing religious services work under the supervision of a Council member. The Council controls 350 entrance passes allowing access to the Jail and distributes these passes to persons providing religious services in the Jail. To gain access to the Jail, a religious group could be recognized as a new group and be given a seat on the Council or it could affiliate with a group already seated on the Council. To gain recognition as a new group, a religious organization needs to present requests from a significant portion of the inmate population for the group's services and show basic religious and philosophical differences from other organizations already represented on the Council. If a new organization was recognized and given a seat on the Council, the current Council members would have to give up some of their allotted entrance passes. More commonly, new religious organizations were placed under the aegis of a current Council member.

The absence of Muslim services in Division One during Siddiqi's residence there can be traced to a dispute over what Muslim group or groups should be given access to the Jail. Since 1979, the American Muslim Mission ("AMM") had represented the Muslim faith on the Council. In June of 1983, representatives of the Muslim Community Center ("MCC") contacted the Director by letter and asked whether they might provide Jumu'ah religious services in the Jail. The Director advised the MCC representatives to present their request to the Council. The MCC did not contact anyone on the Council. They renewed their interest in December of 1983 by again contacting the Director, who asked Reverend Durel of the Council to set up a meeting with MCC officials and William Sullivan, the Superintendent of Division One ("Sullivan"). At this meeting in March of 1984, the MCC representative asked to have his organization recognized as an independent member of the Council, unaffiliated with another organization. Sullivan responded by noting that the AMM already coordinated Muslim activity in the Jail and stated that the MCC should work under the AMM. At its next meeting, the Council itself expressed its agreement with Sullivan, determining the MCC should work under the auspices of the AMM.

Three months later, in June of 1984, the MCC sent another letter to Reverend Durel again requesting independent recognition, claiming they were unable to work with the AMM. The Council reiterated its desire that the MCC work under the AMM and it was skeptical about having to choose between sects. The Council did request additional information from the MCC about its beliefs and tenets and invited its representative to attend the Council meeting scheduled for September 1984. No one from the MCC appeared at that meeting and the Council extended another invitation for the October meeting, still wanting the MCC to work through the AMM. At the October meeting the AMM representative, Yaqub Muhammad ("Muhammad"), and the MCC representatives reached an apparent agreement to cooperate in providing services. However, after the representatives of the two groups had left, the Council was informed by a third party that Muhammad was no longer authorized to speak on behalf of the AMM and was therefore unable to enter into any sort of agreement with the MCC.

This apparent disorder in the Muslim community continued as the Council attempted to determine who was authorized

to represent the AMM. During 1985, the AMM was dissolving and it did not name a new representative to the Council until July. This new representative received Council approval in October, after a thorough examination of credentials. Meanwhile, in November of 1984, the MCC had indicated its refusal to abide by the agreement made at the October 1984 meeting since it was unable to recruit a sufficient number of ministers to provide services at the Jail. From November 1984 until September 1985, no one from the MCC contacted the Council about providing services.

It was during this period of turmoil that Siddiqi contacted the Director, stating that no Jumu'ah services were being conducted in Division One. The Council responded by explaining the problems caused by the divisions in the Muslim community. Uncertainty about who properly represented the AMM made it difficult to assign personnel to minister to all Muslim inmates. The Council told the plaintiff it was attempting to clear a new official representative who would take care of the problem. Siddiqi responded by demanding that a representative of the MCC, Abdudharr Muhammad Khalid Abdullah ("Abdullah"), be granted authorization to perform Jumu'ah services in Division One. The Council discussed Siddiqi's request at its September 1985 meeting and asked Abdullah to attend its October meeting. Mr. Abdullah did not attend, but other representatives of the MCC came to what was described as a very volatile meeting. No agreements were reached, although the newly appointed liaison from the AMM agreed to assist the MCC members in gaining access to the prison. However, by the time regular Muslim services resumed in November, Siddiqi had already been transferred out of the Cook County Jail.

## II. DISCUSSION

At trial, Siddiqi argued that the Jail's refusal to recognize the MCC as a second Muslim group providing services prevented him from attending Muslim services during his time in the Jail. After the presentation of the evidence, the district judge and counsel for the parties discussed possible jury instructions. However, the judge did not present the final jury instructions to either counsel prior to closing arguments. The jury returned a verdict for the Director. The district court denied Siddiqi's motion for judgment notwithstanding the verdict and Siddiqi filed this appeal. Siddiqi argues that the district court should have granted his motion for judgment notwithstanding the verdict and that a new trial should be ordered since the district judge failed to provide counsel with the jury instructions prior to closing argument in violation of Fed.R.Civ.P. 51.

### A. *Judgment Notwithstanding The Verdict*

This court reviews a district court denial of a motion for judgment notwithstanding a jury verdict *de novo*. *Bright v. Land O'Lakes, Inc.*, 844 F.2d 436, 441 (7th Cir. 1988); *Collins v. Illinois*, 830 F.2d 692, 697 (7th Cir.1987). In this review, we must determine whether there is sufficient evidence, when combined with all inferences reasonably drawn, to support the jury's verdict when the evidence is viewed in the light most favorable to the nonmoving party. *See Cygnar v. City of Chicago*, 865 F.2d 827, 835 (7th Cir.1989); *Rakovich v. Wade*, 850 F.2d 1180, 1188 (7th Cir.) (en banc), *cert. denied,* —— U.S. ——, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988); *Christie v. Foremost Ins. Co.*, 785 F.2d 584, 585–86 (7th Cir.1986). This court will not reweigh or reevaluate the evidence—that task is reserved to the jury as factfinder. *Cygnar*, 865 F.2d at 835. We are charged with determining whether the evidence, taken as a whole, provides sufficient support for a jury verdict. *Bright v. Land O'Lakes*, 844 F.2d at 441. To review the verdict rendered by the jury, we must explore what standard needs to be applied to the Director's conduct to determine whether there was adequate evidence to support the jury's determination that the Jail did not violate Siddiqi's right to free exercise.

The Supreme Court has made it clear that "prisoners do not forfeit all constitutional protections by reason of their

conviction and confinement in prison." *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Since inmates retain protections created by the first amendment, *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed. 2d 495 (1972) (per curiam), the Court has found that a prisoner must be given a "reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam).

■ While confinement does not strip a convicted prisoner of all constitutional rights, such rights are limited by the fact of incarceration and by valid penological objectives, such as rehabilitation, deterrence, and security. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). In this case, we must balance Siddiqi's right to be afforded a reasonable opportunity to exercise his first amendment right against the legitimate penological goals of the Jail. *Hadi v. Horn,* 830 F.2d 779, 783 (7th Cir.1987); *Caldwell v. Miller,* 790 F.2d 589, 596 (7th Cir.1986). The Supreme Court has set out the standard for striking such a balance: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). *See also O'Lone,* 482 U.S. at 349, 107 S.Ct. at 2404; *Hadi v. Horn,* 830 F.2d at 785. This test is less restrictive than that ordinarily applied to infringements on constitutional rights in consideration of the need to give appropriate deference to prison officials, avoiding unnecessary judicial intrusion into security problems and other prison concerns. *O'Lone,* 482 U.S. at 349–50, 107 S.Ct. at 2404–05. In *Turner* and *O'Lone,* the Court identified some factors that are helpful in applying this reasonableness test: (1) whether there is a rational relationship between the regulation and the legitimate governmental interest behind the rule; (2) whether alternative means of exercising the right exist; (3) what impact accommo-

dating the prisoner would have on other inmates, guards, and prison administration. *O'Lone,* 482 U.S. at 350–53, 107 S.Ct. at 2405–07. In *Turner,* the Court also found that although it is not necessary for the challenged regulation to pass the least restrictive alternatives test, the absence of ready alternatives is evidence of a regulation's reasonableness. *Turner,* 482 U.S. at 90, 107 S.Ct. at 2262. *Hadi v. Horn,* 830 F.2d at 784.

■ We must now apply this standard to the regulations and policy decisions that prevented Siddiqi from attending Jumu'ah. *See Lane v. Griffin,* 834 F.2d 403, 406 (4th Cir.1987) (test laid out in *Turner* applies equally to policy decisions of prison officials). Looking at the evidence presented to the jury, it is clear that there was sufficient evidence to uphold the jury's verdict and affirm the denial of Siddiqi's motion for judgment n.o.v. The Jail's policies provided that religious ministration to inmates would be handled by the Council. The creation of the Council and the regulations used by the Council to determine who will be allowed into the Jail are rationally related to a "legitimate penological objective"—security in the Jail. Testimony at trial revealed that the Council was created to deal with security problems arising from the large number of religious ministers entering the Jail with little supervision. The Council's main purpose is to coordinate giving credentials to recognized ministers. This court has stated that it is legitimate for prison officials to be concerned about possible security troubles arising from ministers entering the jail. *Hadi v. Horn,* 830 F.2d at 785. Use of the Council to screen applicants is rationally related to the legitimate objective of security.

Siddiqi contends that the screening done by the Council is not legitimate because it favors established religions. Siddiqi claims that the Council's membership was set in 1979 at its founding and no changes seem to be allowed, perpetuating Christian domination of the group. Siddiqi points to the fact that the Council refused to recognize a second Muslim group while at the same time it recognizes as many as nine separate

Christian groups and argues that this shows bias and illegitimacy in the Council's decision. The jury found otherwise, and it is clear that there was sufficient evidence in the record to support such a finding. Siddiqi does not account for the turmoil in the Muslim community that affected the Council's decisions as to proper Muslim representation. There was also evidence that when offered a chance to minister at the Jail, the MCC was unable to recruit the necessary number of ministers. The lack of bias on the part of the Council is demonstrated by their subsequent decision to recognize the MCC and allow it to minister in the Jail. Adequate evidence exists to support the jury's conclusion on this point.

The second factor of the *O'Lone* decision also supports the jury's verdict. The existence of alternatives in the Jail is an important but not controlling factor and we are guided in our analysis by the Court in *O'Lone*. In that case, prison officials implemented rules that effectively prevented Muslim inmates from attending Jumu'ah services. *O'Lone*, 482 U.S. at 345–46, 107 S.Ct. at 2402–03. In upholding those regulations, the Court examined the issue of available alternatives and noted that, while no alternatives to the Jumu'ah service itself existed, other alternatives were sufficient, such as the right to congregate and pray and be given different meals whenever pork is served in the cafeteria. *Id.* at 352, 107 S.Ct. at 2406. In this case, the jury was told about the special meals prepared during Ramadan, the month of fasting, and the alternatives to pork made available to Muslim prisoners. No evidence was shown that reflected any restriction on Siddiqi's ability to practice his religion, save for the inability to attend Jumu'ah services and under this factor, the jury's verdict must stand.

Addressing the third factor, the effect of accommodation on the prison and its inmates, Siddiqi argues that since the Jail already accommodates the individual religious needs of inmates, it would require little extra effort to accede to his request. Siddiqi points out that there was testimony concerning efforts made to accommodate other prisoners, such as procuring special items for American Indian ceremonies and Buddhist ceremonies. Although this testimony is helpful, it does not answer the question of what effect accommodating Siddiqi will have on Jail administration or other inmates. Obtaining special equipment for prisoners has a far smaller impact on the workings of a Jail than allowing in an entirely new group of people without normal screening. It would also have been impractical to have taken Siddiqi to another division since such a transfer would have required the detailing of a number of guards and a high security risk. Although the price of accommodation may not be inordinately high, it is expensive enough to justify a jury determination under this factor. In addition, applying the extra factor established in *Turner*, we find no easily doable alternatives that would lead to a conclusion that the regulations and policies are irrational. The jury's verdict was supported by sufficient evidence and the district court's decision to deny the motion for judgment n.o.v. will not be disturbed.

B. *Rule 51*

Siddiqi bases his second argument on Fed.R.Civ.P. 51 dealing with jury instructions,[1] claiming that the district judge failed to inform counsel for the parties prior to closing arguments of the issue instruction he intended to give the jury. Siddiqi requests that we order a new trial to correct this error.

**1.** Rule 51 states:

At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury. The court, at its election, may instruct the jury before or after argument, or both. No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.
Fed.R.Civ.P. 51.

Siddiqi is correct in asserting that Rule 51 requires that the district judge inform the parties of the instructions to be given. *See Joseph v. Brierton,* 739 F.2d 1244, 1249 (7th Cir.1984). We have stated that "the requirement that the judge inform the parties prior to final argument of his action on requested instructions enables the parties to argue the instructions to the jury without being surprised when the instructions are given." *Hetzel v. Jewel Companies, Inc.,* 457 F.2d 527, 535 (7th Cir.1972), *reversed on other grounds, United States v. Hollinger,* 553 F.2d 535, 543 (7th Cir.1977). *See Joseph,* 739 F.2d at 1248–49 (*Hetzel* requirement that district judge inform counsel of instruction still good law). However, this rule does not mean that the district judge must inform counsel of the precise instructions in advance. *See, e.g., Emerick v. U.S. Suzuki Motor Corp.,* 750 F.2d 19, 22 (3d Cir.1984) (judge not required to inform counsel of instruction defining "defect" in product liability case); *Beimert v. Burlington Northern, Inc.,* 726 F.2d 412, 414 (8th Cir.) (no requirement that judge supply written copy of instructions to counsel), *cert. denied,* 467 U.S. 1216, 104 S.Ct. 2659, 81 L.Ed.2d 365 (1984). If counsel had adequate notice of the substance of the instructions to be given, a failure to precisely comply with

Rule 51 would be harmless and we will not order a new trial under those circumstances without a showing of material prejudice. *See Kastenbaum v. Falstaff Brewing Corp.,* 575 F.2d 564, 574 (5th Cir.1978) (failure to comply did not deprive party of substantial justice), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979); 9 Wright & Miller, Federal Practice and Procedure § 2552.

In this case, we find no evidence that Siddiqi's case was prejudiced by the district judge's failure to completely explain what instructions he would give to the jury. The district judge and counsel for both parties discussed what instructions would be proper at a number of points during the trial. While Judge Marshall did not clearly state what instructions he would give, counsel for both parties were apprised of his thoughts on what issues would be presented to the jury. Judge Marshall's actual issue instruction was based directly on the tests set out in *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) and *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)[2]; those cases should have given counsel some guidance in how to argue their cases to the jury.

---

**2.** The issue instruction given by the district judge was as follows:

The plaintiff claims that while confined in the Cook County Jail from July of 1985 through November of 1985, he was not allowed to pursue his Muslim faith in a manner comparable to the opportunity to worship afforded other prisoners who adhered to other religious precepts.

It is not disputed that the plaintiff was not able to attend Muslim services while he was at the Cook County Jail. Therefore, plaintiff has established that his first amendment right to free exercise of religion was denied by defendant.

Defendant then has the burden of justifying this denial. Specifically, the defendant must establish, by a preponderance of the evidence in the case, that its restriction of plaintiff's right to free exercise of religion was reasonably related to legitimate penological objectives and interests, such as jail security, internal order, or inmate rehabilitation.

In determining whether the restriction was reasonable, you may consider the following factors:

1. whether there was a valid rational connection between the restriction on plaintiff's right to free exercise of religion and the governmental interest or interests that defendant has put forward to justify the restriction; and

2. whether plaintiff had any alternative means of exercising his right to practice his religion; and

3. what impact accommodation of plaintiff's right to practice his religion would have had on jail personnel and resources; and

4. whether the jail could have accommodated plaintiff's free exercise right by other obvious, easy alternatives.

If you find from your consideration of all the evidence that defendant's restriction on plaintiff's right to free exercise of religion was not reasonably related to legitimate penological interests, your verdict must be for the plaintiff. If, on the other hand, you find that the restriction was reasonably related to legitimate penological interests, your verdict must be for the defendant.

It is also important that Siddiqi failed to object to Judge Marshall's failure to present the instructions to counsel. While this failure to object will not bar our review of a Rule 51 violation if the judge gives surprise instructions, *see Joseph*, 739 F.2d at 1248–49, the instructions given in this case were by no means surprise instructions. As we have noted, the case law gave clear guidance on how this case should be presented to the jury and counsel for both parties had many opportunities to discuss possible instructions with Judge Marshall. If a district judge fails to articulate the instructions to counsel prior to closing arguments, counsel must attempt to persuade the district judge to reveal the planned instructions or counsel will lose the opportunity to show prejudice. *See Levin v. Joseph E. Seagram & Sons*, 158 F.2d 55, 58 (7th Cir.1946) ("If counsel requests information as to the instructions and is not satisfied with the response of the court, before he can claim prejudice thereby he will have to do more than acquiesce in the court's response which he thinks unsatisfactory."), *cert. denied*, 330 U.S. 835, 67 S.Ct. 971, 91 L.Ed. 1282 (1947); *see also Garland v. Material Service Corp.*, 291 F.2d 861, 863 (7th Cir.1961). Counsel has a duty to register proper objections, even at the risk of incurring the wrath of the trial judge. *United States v. Warner*, 855 F.2d 372, 374 (7th Cir.1988). Judge Marshall's failure to precisely follow the guidelines of Rule 51 was harmless error and we deny Siddiqi's request for a new trial.

### III. CONCLUSION

The district court was correct in denying Siddiqi's motion for judgment notwithstanding the verdict and the district judge did not commit reversible error by failing to inform counsel of the precise jury instructions prior to closing arguments. For the reasons stated above, the district court's judgment is AFFIRMED.