**Rabb RA CHAKA, Plaintiff,**

v.

**Gayle M. FRANZEN, et al., Defendants.**

**No. 79 C 3007.**

United States District Court,
N.D. Illinois, E.D.

Dec. 18, 1989.

William J. Scott, William Ristorious, Attorney General's Office, Chicago, Ill., for defendants.

## MEMORANDUM ORDER AND OPINION

ASPEN, District Judge:

Pro se plaintiff Rabb Ra Chaka brings this civil rights action pursuant to 42 U.S.C. § 1983. He sues Illinois Department of Corrections officials for violations of his civil rights which allegedly occurred when defendants ordered a "lockdown" at Stateville Correctional Center ("Stateville"), and thereafter placed Stateville under a "unit management system." Ra Chaka, a Muslim, objects to limitations imposed on his religious freedoms pursuant to the change in Stateville's prison management system. This action comes before the court on defendants' motion for summary judgment pursuant to Fed.R.Civ.P. 56. For the reasons discussed below, the court grants defendants' motion for summary judgment and dismisses this action in its entirety.

## FACTS

Ra Chaka filed this lawsuit five months after Stateville officials implemented a state of emergency and subsequent lockdown at Stateville on February 23, 1979. Pursuant to the lockdown, officials reclassified all inmates into one of three categories (aggressive and predatory types, normal-situational types, and passive-dependent types). After completing the reclassification, defendants separated inmates by those same categories into respective "houses" or units. *See* Richard DeRobertis Affidavit, Doc. 7, Ex. A., p. 1 ("DeRobertis Aff.").[1] Every effort was made to

Rabb Ra Chaka, Vienna, Ill., pro se.

---

1. Ra Chaka objects to defendants' use of the deposition testimony of Reverend David Ledford, Head of Chaplaincy at Stateville because Ra Chaka was not given notice of the taking of the deposition. The deposition, dated May 19, 1982, was taken pursuant to *Hakim v. Frazen,* 79 C 3124, a lawsuit with which Ra Chaka's lawsuit was at one time consolidated. The *Hakim* plaintiffs were also Stateville Muslim inmates who sued for alleged violations of their religious

freedoms. Five of the seven defendants named in Ra Chaka's lawsuit were also named in *Hakim.* In 1980 Ra Chaka requested that the consolidation order be vacated and that he be allowed to stand on his original complaint. The court granted Ra Chaka's request. Order, Doc. 22. Ra Chaka's request was granted two years before Ledford's deposition was taken. Thus, Ra Chaka cannot be considered to have been a

keep the groups from mixing and each unit was under the supervision of its own "Unit Manager." *Id.* The new "unit management system" was modeled after one already in existence in the federal penetentiary system.

In July, 1979 following the lockdown, Assistant Warden Richard DeRobertis denied a request by Muslim inmates to provide bi-monthly, inter-unit assemblies for the Jumah Prayer service. The Jumah service is the Muslim weekly religious observance mandated by the Koran, the Muslim Holy Book. DeRobertis denied the request as antithetical to the concept of "unit management" because it involved mixing the various "units" or cellhouses. *Id.* at p. 2. DeRobertis, however, authorized the prison's Islamic chaplain to conduct *individual* Jumah services at the various cellhouses, at locations approved by the respective Unit Managers. *Id.* Four days after DeRobertis denied the inter-unit Jumah assemblies (but authorized individual cellhouse Jumah services), Ra Chaka filed this lawsuit.

Ra Chaka alleges that the lockdown and Stateville's subsequent conversion to the unit management system violated the free exercise clause of the first amendment because it limited him in the exercise of his Muslim beliefs. He asserts that defendants violated his first amendment rights when they prohibited him from attending weekly Jumah services. He also alleges that defendants violated his equal protection rights because they failed to provide Muslim inmates with the same amount of funding and religious materials provided to other religious groups. Defendants contend that the issues are moot because Stateville now conducts weekly Jumah services and that, in any event, defendants are shielded from liability by the eleventh amendment.

For a period, this lawsuit was consolidated with another lawsuit, *Hakim v. Franzen*, 79 C 3124, a class action which plaintiffs ultimately voluntarily dismissed. In January 1980, however, the court vacated the consolidation order upon Ra Chaka's request that he be allowed to proceed separately on his original complaint.

## DISCUSSION

A pro se plaintiff's complaint must be liberally construed. *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972). Additionally, summary judgment is not appropriate unless there exists no genuine issue of material fact, and defendants are entitled to judgment as a matter of law. *Egger v. Phillips*, 669 F.2d 497, 502 (7th Cir.1982), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983).

### A. *Preliminary Issues.*

■ Stateville currently conducts weekly Jumah services on Fridays. Defendants' Supplemental Memorandum, Doc. 70, Ledford Affidavit; Muhammad Affidavit. Additionally, Reverend David Ledford and Agin Muhammed, both chaplains at Stateville, also attest that numerous Islamic Studies classes are conducted throughout the week, (weekly class schedules were attached to the affidavits), and that Muslim religious personnel and materials are also provided to the Muslim inmates. *Id.* In his responsive pleadings Ra Chaka does not refute these facts. Because weekly Jumah services are now provided at Stateville, as are religious personnel and materials, defendants argue that Ra Chaka's claim is moot.

Ra Chaka's petition for injunctive and declaratory relief is moot regarding his re-

---

party in the *Hakim* lawsuit at the time defendants took Reverend Ledford's deposition.

The court agrees that the use of Ledford's deposition testimony taken pursuant to *Hakim* is not admissible against Ra Chaka. Fed.R. Civ.P. 32(a) and Fed.R.Evid. 804(b)(1). By the terms of Fed.R.Evid. 804(b)(1) Ledford's testimony may be used against Ra Chaka only if Ledford is declared an "unavailable witness"

and *Hakims'* plaintiffs are shown to have been "predecessor[s] in interest" to Ra Chaka's lawsuit. *See* 5. C. Wright and Miller, "Federal Practice and Procedure," § 2150, Supplement, p. 212. Despite the similarities in issues and in parties, defendants make no showing that the requirements of Fed.R.Evid. 804(b)(1) are met and Ledford's deposition testimony is not admissible against Ra Chaka.

quest for weekly Jumah services, because those services are now provided at Stateville. *See e.g., Young v. Coughlin,* 866 F.2d 567, 568 n. 1, (2d Cir.), *cert. denied,* 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989). His claim for money damages, however, allegedly resulting from defendants' failure to provide weekly adequate religious services in the past is not moot. *See Johnson–Bey v. Lane,* 863 F.2d 1308, 1312 (7th Cir.1988).

■ Defendants also argue that they are protected from liability in their official capacity by the eleventh amendment which prohibits damage actions against state officials in their official capacity unless the state consents to the suit. *See eg., Shockley v. Jones,* 823 F.2d 1068, 1070–71 (7th Cir.1987). As stated in the caption of his Complaint, however, Ra Chaka expressly sued the defendants in both their individual and official capacities. The eleventh amendment does not shield a state public official from potential liability when he is sued in his personal or individual capacity (as contrasted with his official capacity). *Shockley,* 823 F.2d at 1070. Consequently, Ra Chaka's claim for money damages against defendants in their individual capacities for alleged violations of the free exericise clause and equal protection guarantees are neither moot nor barred by the eleventh amendment.

### B. First Amendment, Free Exercise Clause

■ The first issue is whether, pursuant to its lockdown and subsequent introduction of the unit management system, the defendants' failure to provide weekly inter-unit Jumah services violated Ra Chaka's right to religious freedom as guaranteed by the free exercise clause of the first amendment.

Even while incarcerated, prisoners retain protections afforded by the first amendment, including its directive that no law shall prohibit the free exercise of religion. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). Prison regulations alleged to infringe constitutional rights, however, are judged under a "reasonableness" test

which is less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. *Id.* at 349, 107 S.Ct. at 2404. This is to insure that courts afford appropriate deference to prison officials in the conduct of their administrative duties. *Id.* When a challenged prison regulation impinges on an inmate's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *Siddiqi v. Leak,* 880 F.2d 904, 909 (7th Cir.1989). Four factors are helpful in applying this "reasonableness test": 1) whether there is a rational relation between the regulation and the legitimate government interest behind the rule; 2) whether alternative means of exercising the right exist; 3) what impact accomodating the prisoner would have on other inmates, guards and prison administration; and 4) although not required under the analysis, the absence of ready alternatives is also evidence of a regulation's reasonableness. *Siddiqi,* 880 F.2d at 909.

Applying the aforementioned factors to Stateville's unit management system, and its prohibition of weekly inter-unit Jumah services, the court concludes Ra Chaka's first amendment claim must fail. The lockdown and the subsequent introduction of the unit management system, relative to the weekly inter-unit Jumah services, were regulations or policies which were reasonably related to a legitimate penological objective namely, prison security.

Stateville is a maximum security prison. Stateville authorities put the prison on lockdown status in February 1979 due to a volatile inmate population. Shortly thereafter all inmates were classified and separated into the various "units" each of which was to remain separate and independent from the others. This unit management system was initiated concurrently with and in response to the lockdown. DeRobertis Aff., p. 1. The new system was implemented to break up Stateville into smaller, more manageable units. *Id.* As a result, more recreational activities and

other services were made available for all residents. *Id.*

Prior to the lockdown Muslim residents at Stateville were allowed to congregate on each Friday for Jumah Prayer services and on each Saturday for prayer and discussion. Additionally, they were allowed to celebrate Ramadan Fast, another Muslim religious observance. Plaintiff's Response Motion, Doc. 13, p. 3 ("Doc. 13"). Several months following the February 1979 lockdown, however, DeRobertis denied the Muslim inmates' request to reinstate Jumah services as inter-unit assemblies. DeRobertis Aff., p. 2. DeRobertis expressly denied the request because it did not comport with the concept of the newly implemented unit management system. *Id.* Defendants advised Ra Chaka that the unit management system needed time to prove its usefulness. Plaintiff's Response Memorandum of Law, Doc. 12, p. 4 ("Doc. 12").

In light of the volatility of the institution—which was sufficient enough to throw it into lockdown status in February 1979—prison security was obviously a paramount objective. Shortly thereafter, while trying to implement a new system for prison management and security control, defendants denied a request which would have required the bi-monthly mixing of the newly separated units—a concept which at that time was antithetical to the newly initiated system. Even absent a security "crisis," the daily management of prison operations is best left to the knowledge and expertise of prison administrators. *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). Moreover, the safety of the prison's guards and inmates is perhaps the most fundamental responsibility of the prison administrators. *Hewitt v. Helms,* 459 U.S. 460, 473, 103 S.Ct. 864, 872, 74 L.Ed.2d 675 (1983). Consequently, in light of the obvious security concerns, Stateville's lockdown and the introduction of the unit management system were reasonably related to legitimate penological objectives and thereby satisfied the first *Turner* requirement.

The second *Turner* factor, the availability of alternative means for inmates to practice their religion, is also satisfied. Fairly quickly following the lockdown, Stateville's Muslim inmates had many of their religious opportunities restored. For example, following the lockdown in February, Jumah services were reinstated on a bi-monthly basis. Doc. 12, p. 3. Initially restored on Sundays, bi-monthly Jumah services eventually were moved back to Fridays as required by the Koran. *Id.,* at p. 4. Additionally, as early as June 1979 two Islamic Studies classes were scheduled on a weekly basis. Doc. 12, Exhibit No. 5. Also, by August 1979 DeRobertis had authorized Jumah services in the inmates' individual unit cell-houses. DeRobertis Aff., p. 2. Only the "corporate religious service," which involved inter-unit assembly, was prohibited. By August 24, 1979 on every Friday, Staff Muslim Chaplain Iman Agin Muhammad was authorized to lead Islamic prayer services in each individual cellhouse. Doc. 12, Exhibit No. 4. By June 1983 Muslim inmates were sufficiently satisfied with the arrangements for the practice of their religion that they voluntarily dismissed the class action, *Hakim v. Franzen,* 79 C 3124.[2] Notwithstanding Stateville's prohibition against large inter-unit assemblies, therefore, the second *Turner* factor is also satisfied because "alternative means" of exercising the right to practice their religion existed for the Muslim inmates. The "ability to participate in other Muslim religious ceremonies" satisfies the second *Turner* factor. As the Supreme Court stated in *O'Lone v. Estate of Shabazz:*

> While we are in no way minimize the central importance of Jumu'ah to respondents, we are unwilling to hold that prison officials are required by the Constitution to sacrifice legitimate penological objectives to that end. In *Turner* ... [we examined] whether the inmates were deprived of "all means of expression." *Ante* at 92 [107 S.Ct. at 2263]. Here,

**2.** The court takes judicial notice of the plaintiffs' voluntary dismissal in *Hakim v. Franzen,* 79 C 3124.

similarly, we think it appropriate to see *whether under these regulations respondents retain the ability to participate in other Muslim religious ceremonies.*

482 U.S. at 351–52, 107 S.Ct. at 2406 (emphasis added).

The third *Turner* factor, an examination of the potential impact of acceding to Ra Chaka's request, also supports this conclusion. Although weekly prayer groups and bi-monthly Friday Jumah services were available in the individual cellhouses shortly following the lockdown, *see* Doc. 12, pp. 4–5, Ra Chaka wanted weekly services conducted on an inter-unit ("assembly") basis. The potential impact of that request is obvious. As DeRobertis attests, the mixing of the newly created units was contrary to the concept and purpose of the new management system and, for this reason, it was turned down. DeRobertis Aff., p. 2. Defendants advised Ra Chaka that the unit management system needed time to prove its usefulness. Doc. 12, p. 4. Prison administrators could not immediately accommodate Ra Chaka's request without undue disruption to the new system which had been implemented only recently.

Finally, the absence of a ready alternative to the disputed regulation or policy may also be evidence of the reasonableness of the regulation. This court finds "no easily doable alternatives" (and Ra Chaka proffers none), that would lead to a conclusion that the policy prohibiting inter-unit assemblies was irrational.[3] *See Siddiqi,* 880 F.2d at 910. Moreover, administrators

are not required to "set up and then shoot down every conceivable alternative method of accommodating the plaintiff's constitutional complaint" in order to satisfy a constitutional challenge. *Turner,* 482 U.S. at 90–91, 107 S.Ct. at 2262–2263. In short, therefore, it is reasonable to conclude that at that time Stateville administrators had no ready alternative to the prohibition of inter-unit Jumah assemblies.

Thus, when the four *Turner* criteria are examined in light of the extreme urgency of the situation at the time of the lockdown and the need for security at Stateville immediately following implementation of the new management system, the prohibition of Muslim services did not violate Ra Chaka's first amendment rights.[4] Consequently, defendants' motion for summary judgment as to Ra Chaka's first amendment claim for money damages is granted.[5]

### C. Equal Protection

■ Ra Chaka also claims that defendants violated his equal protection rights by refusing to apportion the Muslim inmates "an Equal portion of the Fiscal Budgets" (sic) and by failing to make available "adequate space facilities," sufficient religious materials and religious literature.

Prisons are required to provide inmates with a "reasonable opportunity" to exercise their faith. *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam). That dictate, however, does not compel courts to adopt a numerical standard in analyzing prisoner religious

---

**3.** The four factor *Turner* test applies equally to policy decisions of prison officials as to prison regulations. *Siddiqi v. Leak,* 880 F.2d 904, 909 (7th Cir.1989).

**4.** The volatility of the Stateville prison atmosphere for the time period at issue is of central importance to this court's analysis of Ra Chaka's claim. The withdrawal of all of weekly Jumah services *today,* however, might present an entirely different question, but as noted above, Muslim inmates presently are provided with weekly Jumah services and a wealth of other opportunities to practice their religious obligations.

**5.** Although defendants do not raise the defense in their motion, it would appear they would be

entitled to qualified immunity on Ra Chaka's first amendment claim concerning the denial of weekly inter-unit Jumah services. *See Hadi v. Horn,* 830 F.2d 779, 788 n. 22 (7th Cir.1987); *Card v. Dugger,* 709 F.Supp. 1098, 1111 (M.D. Fla.1988). Government officials are generally shielded from liability for damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). At the time of the violations alleged in this case, no existing case law would have placed defendants on notice that the cancellation of religious services for the reasons and under the circumstances described herein exposed them to damage liability. *Hadi,* 830 F.2d at 788, n. 22.

**460**

equal protection claims. *Butler–Bey v. Frey*, 811 F.2d 449, 453–54 (8th Cir.1987). Instead, *Cruz* requires "reasonable opportunities" afforded to all prisoners to exercise their religious freedom. It does not require an equal apportionment, or identical opportunities:

> We do not suggest, of course, that every religious sect or group within a prison—however few in number—must have identical facilities or personnel. A special chapel or place of worship need not be provided for every faith regardless of size, nor must a chaplain, priest or minister be provided without regard to the extent of demand.

405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2.

Prisons may not discriminate against minority faiths except to the extent required by the exigencies of prison administration. *Johnson–Bey v. Lane*, 863 F.2d 1308, 1312 (7th Cir.1988). Instead, they must provide a "reasonable opportunity" comparable to fellow prisoners who adhere to conventional religious precepts. *Cruz v. Beto*, 405 U.S. at 322, 92 S.Ct. at 1081; *Childs v. Duckworth*, 705 F.2d 915, 920 (7th Cir. 1983). What constitutes a "reasonable opportunity" of pursuing faith, however, must be evaluated in light of the prison officials' interest in security. *Johnson–Bey*, 863 F.2d at 1310. Inmates have only those first amendment rights that are consistent with prison discipline and do not conflict with legitimate objectives of institutional administration. *Williams v. Lane*, 851 F.2d 867, 877 (7th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989).

That Ra Chaka is now provided with a "reasonable opportunity" to practice his religious freedoms does not appear to be disputed. As of August 1989, Muslim inmates have numerous religious instruction classes on a weekly basis, private counseling, their own Muslim Chaplain and weekly Jumah services. Defendants' Supplemental Memorandum of Law, Doc. 70, Ledford Aff.; Muhammed Aff. Further, as previously noted, Ra Chaka had access to sufficient religious opportunities almost immediately following the lockdown. *Infra*, at 7. That months may have elapsed between the lockdown and the *complete* restoration of Muslim religious opportunites does not require a finding that defendants denied Ra Chaka a "reasonable opportunity" to observe his religious freedoms. Documentation submitted by both Ra Chaka and defendants suggests that the contrary is true.

Ra Chaka does not allege that he was prohibited from receiving religious literature from outside prison, or that he was punished for the exercise of his Muslim beliefs. Similarly, he does not allege that the prison's allocation of resources foreclosed him from practicing his faith or denied him any basic right of conscience. *See Butler–Bey*, 811 F.2d at 454; *Thompson v. Kentucky*, 712 F.2d 1078, 1080 (6th Cir. 1983).

Ra Chaka, therefore, was provided with a reasonable opportunity to pursue his religious freedoms within a reasonable time following the lockdown. Mindful that courts are not compelled to adopt a numerical standard in evaluating prisoner equal protection religious claims, those opportunities afforded to Ra Chaka, considered in light of prison officials' legitimate security concerns, satisfied constitutional standards. Absent any suggestion that Ra Chaka was deprived of a reasonable opportunity to practice his religion, the mere failure to accord Muslims a precisely equal portion of the budget does not violate equal protection. Accordingly, defendants' motion for summary judgment as to the equal protection claim is also granted.

## CONCLUSION

For all of the foregoing reasons, there is no genuine issue of material fact and defendants' motion for summary judgment as to Ra Chaka's first amendment and equal protection claims are granted. This action is dismissed in its entirety. It is so ordered.