Gloria E. GONZALEZ, Plaintiff,

v.

Police Commissioner William BRATTON, Police Commissioner Howard Safir, the New York City Police Department, Mayor Rudolph Giuliani, the City of New York, Joseph Powell, Anthony Kissik, Thomas Praskash, Marc Nell, Captain Witkowich, and Sergeant Burke, Defendants.

Gloria E. Gonzalez, Plaintiff,

v.

Police Commissioner William Bratton, Police Commissioner Howard Safir, the New York City Police Department, Mayor Rudolph Giuliani, the City of New York, Patrolmens Benevolent Association of the City of New York, Jeffrey Mishula, Dr. Stanley Edelman, Mark Nell, Sergeant Burke, Captain Witkowich, Anthony Kissik, Thomas Praskash, and Captain Connolly, Defendants.

Nos. 96 Civ. 6330(VM), 97 Civ. 2264(VM).

United States District Court, S.D. New York.

June 13, 2001.

## DECISION AND ORDER

MARRERO, District Judge.

This case involves related actions brought by plaintiff Gloria Gonzalez ("Gonzalez") under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, and the New York State and City Human Rights Laws ("HRLs"). After a three week trial in late September and October 2000, a jury returned a verdict in favor of Gonzalez and against the City of New York on claims of retaliation and constructive discharge. The jury also found individual defendants Anthony Kissik ("Kissik") and Stanley Edelman ("Edelman") liable both for retaliation and constructive discharge under the HRLs and for common law intentional infliction of emotional distress. In addition, the jury found defendant Nicholas Witkowich ("Witkowich") liable for retaliation under the HRLs; unlawful search and seizure in violation of the Fourth Amend-

ment pursuant to 42 U.S.C. § 1983; false imprisonment under state law; and intentional infliction of emotional distress.

The jury awarded Gonzalez compensatory damages of $1,250,000.00 against the defendants collectively (the "City Defendants"). This amount comprised $200,000.00 for lost past earnings; $800,000.00 for lost future earnings; and $250,000.00 for emotional distress and related pain and suffering. Finally, the jury found that punitive damages, in amounts to be determined by the Court, were warranted against Witkowich, Kissik and Edelman.

City Defendants now move for alternative forms of relief: for judgment as a matter of law pursuant to Rule 50, or a new trial pursuant to Rule 59, of the Federal Rules of Civil Procedure; remittitur of damages; or a new trial on damages. For the reasons described below, the Court denies the motions. The Court also rules herein on the imposition of punitive damages against Kissik, Edelman and Witkowich and on Gonzalez's request for pretrial interest, attorney's fees and costs.

## STANDARD OF REVIEW

A judgment as a matter of law pursuant to Fed. Rule Civ. P. 50 may be granted only where the evidence produced at a trial demonstrates (1) such a complete absence of support for a verdict that a jury's factual findings could only have been the result of sheer surmise and conjecture; or (2) such an overwhelming showing of facts favoring the movant that reasonable and fair-minded persons could not arrive at a verdict against that party. *See Ryduchowski v. Port Auth.*, 203 F.3d 135, 142 (2d Cir.), *cert. denied*, 530 U.S. 1276, 120 S.Ct. 2743, 147 L.Ed.2d 1007 (2000). In reviewing the motion, the Court does not substitute its own judgment for that of the jury, but must consider the evidence in a

light most favorable to the prevailing party. *See id.*

■ The standard governing a motion for a new trial under Fed. Rule Civ. P. 59 involves more judicial discretion than does a motion for judgment as a matter of law. The Court may grant relief if it determines that the jury's verdict is seriously erroneous or against the weight of the evidence, such that its enforcement would constitute a miscarriage of justice. *See United States v. Landau*, 155 F.3d 93, 104 (2d Cir.1998). Thus,

> [u]nlike judgment as a matter of law, a new trial may be granted even if there is substantial evidence supporting the jury's verdict. Moreover, a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner. A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is "egregious." Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility.

*DLC Mgt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 134 (2d Cir.1998) (citations omitted).

### FACTS

The background and material facts relevant to this case are set forth in the Court's earlier opinion granting in part and denying in part the motions for summary judgment brought by City Defendants in this matter. *See Gonzalez v.*

*Bratton*, Nos. 96 Civ. 6330, 97 Civ. 2264, 2000 WL 1191558 (S.D.N.Y. Aug.22, 2000).[1] For the purposes of the Rule 50 motion, the Court will review, in the light most favorable to Gonzalez as the party opposing the motion for judgment as a matter of law, the evidence placed by Gonzalez in the trial record.

Gonzalez's case was supported primarily by her testimony and that of Adam Alvarez ("Alvarez"), a former employee of the New York City Police Department's ("NYPD" or the "Department") Advocate's Office who had been given the charge of reviewing various disciplinary charges brought against Gonzalez that are at issue here. Kissik served as commander of the 50th Precinct where Gonzalez was assigned during times relevant to this case. According to Gonzalez's case theory and testimony --- as corroborated by Alvarez --- Kissik engaged in a purposeful campaign to oust Gonzalez from her employment at the NYPD. Gonzalez asserted that Kissik, motivated by a desire to remove Gonzalez from the NYPD, subjected her to particularly heavy-handed supervision. Kissik's purpose allegedly stemmed in part from a sexual harassment complaint Gonzalez had filed internally with the NYPD against John Powell ("Powell"),[2] her former supervisor at the 45th Precinct, from which Gonzalez was transferred to the 50th Precinct.

Kissik allegedly ordered other officers working under him at the 50th Precinct to "ride her," which entailed vigilantly scrutinizing Gonzalez's actions and creating a

**1.** The Court granted City Defendants' motions for summary judgment dismissing Gonzalez's quid quo pro harassment and gender discrimination claims and denied the motions as regards the claims of hostile environment, sexual harassment, retaliation and other alleged violations of Gonzalez's rights that were the subject of the trial. Prior to submitting the

case to the jury, the Court also dismissed additional claims Gonzalez had alleged for false arrest and First Amendment violations.

**2.** Powell, one of the named defendants, was accused of hostile environment sexual discrimination. The jury found no liability on Gonzalez's sexual harassment claims.

disciplinary record against her by "writing her up" even for minor infractions of rules and perceived insubordination. *See* Trial Transcript ("Tr.") at 230–31; 1089; 1095–96. According to Gonzalez, not only did Kissik order other officers to give Gonzalez a hard time in general, but he also subjected her to continual and unusual shift changes and assignments and had her transferred in mid–1994 to the Bronx Court Section, a work location known to carry a stigma as being staffed by officers who had performance and disciplinary problems. Under Gonzalez's theory, as supported by Alvarez's testimony and related evidence, Kissik's actions towards her were not isolated, but formed part of a concerted effort by higher officials to rid the NYPD of troublesome officers, including Gonzalez, so marked on the Personnel Director's "hit list." *See* Tr. at 1097; 1100–01.

In August 1995, Sergeant Praskash, Gonzalez's immediate supervisor at the 50th Precinct, issued a disciplinary charge against Gonzalez allegedly acting pursuant to Kissik's orders to "ride her." The action claimed insubordination for an incident that commenced with Gonzalez expressing that she would not be able to perform an assignment that conflicted with another work-related court appointment. The resulting conflict with Praskash escalated to the point where Gonzalez was threatened with arrest if she did not turn over her gun and accept a suspension.

Although Kissik was not present when this incident occurred, Gonzalez indicated and the record supports a reasonable jury finding that the event was actually the culmination of the harassment campaign that Kissik had instituted the previous year in retaliation for Gonzalez's discrimination complaint against Powell, a campaign which had resumed immediately upon Gonzalez's return to the 50th Pre-

cinct from the Bronx Court Section in June 1995. In July 1995, Gonzalez filed a charge with the federal Equal Employment Opportunity Commission ("EEOC") and the State Division of Human Rights alleging sexual discrimination based on the events she had experienced during her assignments at the 45th and 50th Precincts and the Bronx Court Section. This charge was amended and supplemented in September 1995.

According to Gonzalez's testimony, the treatment she suffered on account of Edelman, who was in charge of the NYPD's medical services, followed the same general pattern as Kissik's conduct towards her. In particular, Gonzalez claimed that Edelman also brought baseless disciplinary charges against her that caused her to be suspended without pay multiple times and created a misleading record to make her appear insubordinate. *See* Tr. at 298–337.

In the months between Gonzalez's filing of her EEOC complaint in July 1995 and her departure from the NYPD in April 1996, Edelman was responsible for several disciplinary charges against Gonzalez that resulted in repeated 30–day suspensions without pay based on allegations that Gonzalez contended were unmerited and retaliatory. These charges included failure to submit for a medical examination; failure to report for a medical appointment at a particular time Gonzalez stated was different from the time she previously had been told; and lying about her means of transportation to an appointment at the NYPD medical services facilities in Queens. *See* Tr. at 303; 321; 323–34.

Concerning Edelman's specific conduct, Gonzalez described several incidents where he ignored other doctors' reports regarding her medical condition; returned her to work when she felt physically unable to do so; referred her without basis for a psychological exam; and called her a "wacko."

*See* Tr. at 222; 300. As an example, Gonzalez described a particular visit she made to the NYPD medical services facilities for back and neck pain, at which Edelman, rather than examining the specific location of that pain, checked her nose and throat. When Gonzalez questioned Edelman's attention to her nose and throat and his failure to wear gloves as he conducted the examination, Edelman responded by sending her for psychological services and suspending her without pay for refusing to comply with an order to be medically examined.

Gonzalez also challenged the reasonableness of Edelman's charge that she had lied to him about how she had arrived at a medical appointment, although he did not inquire further about what he perceived as an inconsistency in her story. Gonzalez claimed that Edelman ordered her to return for specific duty shifts that were different from what was reported to the NYPD, so that disciplinary charges of absences were filed against her when she appeared for the wrong shifts.

Gonzalez's departure from the NYPD was ultimately triggered by a drug test (the "Dole Test") she was ordered to undergo. In this connection, police officers from the Department's Internal Affairs Bureau appeared at Gonzalez's home to conduct the test or escort her to a facility where it would be performed. *See* Tr. at 337–40. Gonzalez testified that she feared for her safety in accompanying the officers; was concerned that the results of the test could be altered; and felt that the test was an aspect of the NYPD's harassment campaign to oust her. Accordingly, she refused to undergo the Dole Test or accompany the officers. *See* Tr. at 340–41; 345.

Further charges were then brought against Gonzalez as a result of which, when brought to an NYPD trial on them, she was led to believe that she would be fired if she did not resign. *See* Tr. at 357. On the day the department trial was to take place in April 1996, Gonzalez, rather than proceeding to an adjudication, executed a resignation to resolve the disciplinary charges. The trial record on the matter before the Court produced substantial dispute as to whether there was sufficient reasonable suspicion for the NYPD to order Gonzalez's Dole Test and whether in doing so the Department properly followed applicable internal procedures.

Finally, Gonzalez claimed that Witkowich, motivated by retaliatory animus toward Gonzalez that had reached other NYPD officers, sought to humiliate her and prolong her detention after she was arrested, two months after she had left the force, for a traffic violation. In this connection, Gonzalez was brought to the 40th Precinct, where Witkowich was commander, when she did not produce identification to the officers who stopped her vehicle. Gonzalez described having been detained for 27 hours after being brought to the 40th Precinct under Witkowich's orders. She testified that at the station house she recognized an officer with whom she had worked at the 50th Precinct under Kissik; that this officer went to talk to Witkowich when she was brought into the Precinct; and that Witkowich himself later said to Gonzalez: "I don't need commotion by a woman like you." *See* Tr. at 373.

Gonzalez claimed at trial that Witkowich then ordered that she be subjected to an invasive search for which there was no sufficient cause, including a strip search, as well as a breathalyzer test administered at another precinct. Gonzalez introduced evidence suggesting that Mark Nell, the officer who stopped her for the traffic violation, did not believe she was then under the influence of alcohol and that the charge he wrote up at the time of the initial

detention related to failing to stop at a traffic light and not possessing a driver's license or vehicle registration. Subsequently, however, under Witkowich's direction when Gonzalez was in the 40th Precinct being processed in connection with the traffic offenses, meritless charges were added, including possession of marijuana allegedly found during a search of her car and criminal impersonation of a police officer.

The marijuana count was later dropped, and a jury found Gonzalez not guilty of the impersonation charge. Evidence in the record supports Gonzalez's allegation that the basis for the charge of criminal impersonation was Gonzalez's having shown an expired police parking permit to Nell, although Nell gave ambiguous or conflicting accounts as to whether he believed Gonzalez had told him she was a current police officer. See Tr. at 1653–54. Cruz Gonzalez, a friend of Gonzalez traveling with her as a passenger at the time of the incident, corroborated Gonzalez's testimony that Gonzalez identified herself to Nell as a former police officer.

In September 1996, Gonzalez filed another charge with the EEOC alleging additional acts of retaliation by City Defendants that encompassed the events related to her June 1996 arrest and imprisonment.

Most, if not all, of the material facts supported by Gonzalez's evidence were sharply contested by the City Defendants and their witnesses. The evidence as a whole may be taken into account in the Court's ruling on the motions for judgment as a matter of law or for a new trial. Given the fundamental conflicts in the parties' accounts of many critical facts, a resolution of which side's version comes closer to the truth necessarily rests on matters of credibility of witnesses; what testimony or documents are credited; and the weight accorded to particular evidence. These

are all matters uniquely within the province of the trier of facts.

The Court finds that reasonable and fair-minded persons according credibility to Gonzalez and her witnesses could arrive at the verdict reached by the jury here. The Court is further of the view that the verdict was not seriously erroneous or against the weight of the evidence, in light of the substantial conflicting testimony and other contrasting evidence presented by the parties during the trial. Accordingly, the Court concludes that, assigning credibility to witnesses and giving appropriate weight to the evidence Gonzalez adduced, the jury's verdict here can be sustained as a matter of law.

## DISCUSSION

### I. MOTION FOR JUDGMENT AS A MATTER OF LAW

City Defendants challenge the jury's verdict with regard to each of Gonzalez's claims, contending that it must be set aside, as a matter of law, because the evidence does not support the elements necessary to state a claim for intentional infliction of emotional distress; retaliation; constructive discharge; unreasonable detention or unlawful search; or the forms and the extent of the corresponding damages the jury awarded. These arguments are considered in turn below.

### A. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### 1. Notice

■ In connection with Gonzalez's claim of intentional infliction of emotion distress, the City Defendants contend that the action is barred by the one-year statute of limitations because the Notices of Claim Gonzalez filed against Kissik and Edelman contained no allegation of intentional inflic-

tion of emotional distress. Moreover, Witkowich argues that Gonzalez's charges against him do not satisfy the standard for such a claim. As Gonzalez points out, the notice-defect defense City Defendants now assert was not raised as part of their Rule 50 motion or in answers to the pleadings, although the Joint Pretrial Order includes a description of the claimed defect.

The City Defendants alluded to a defense of inadequate notice at a conference regarding the jury instructions. The Court then stated that further information would be required to address the issue. City Defendants, however, did not again raise the issue or respond to the Court's request for more discussion of the nature of the notices themselves. There was thus no factual support for the affirmative defense that notice was inadequate, and the Court considers the City Defendants to have waived the opportunity to argue it.

■ Even if the defense was not waived by the City Defendants' failure to pursue it, the Court disagrees that the notice was inadequate here. The notice-of-claim provision of New York law is intended to enable a prompt investigation and presentation of evidence of the facts and circumstances out of which claims arise. *See Ismail v. Cohen,* 706 F.Supp. 243, 250 (S.D.N.Y.1989), *aff'd,* 899 F.2d 183 (2d Cir.1990). Thus, not every claim need be set forth *in haec verba,* as long as the details pertaining to such a claim are described sufficiently with respect to time, place and manner "to enable the city to investigate the claims." *Id.*

Although intentional infliction of emotional distress may not have been specified initially by Gonzalez as a claim, the City Defendants learned of the events underlying the claims through notice of Gonzalez's various retaliation and discrimination charges. City Defendants were given the opportunity to make a prompt investiga-

tion of the underlying basis for the federal and state law claims and thus had sufficient notice to fulfill New York's notice requirement.

### 2. *Timeliness*

■ With respect to the timeliness of Gonzalez's intentional infliction of emotional distress claim, City Defendants argue that the charges against Kissik and Edelman are time-barred by New York's one-year statute of limitations for such actions. *See* N.Y. Civ. Prac. L. & R. § 215(3) (McKinney 2001) ("CPLR"). Here, however, the Court finds that the claims were timely filed against Kissik and Edelman within the one-year and ninety-day limitations period established by New York General Municipal Law § 50–i. *See* N.Y. Gen. Mun. Law § 50i (McKinney 1999).

Although some courts have applied the CPLR limitation period in claims against municipal defendants, those courts which have specifically addressed the conflict between the provisions of CPLR § 215(3) and General Municipal Law § 50–i have generally found that, in light of specific language in § 50–i(3), the statute is intended to override inconsistent provisions of law, and the longer one-year and ninety-day limitations period applies to claims against City Defendants for intentional infliction of emotional distress. *See, e.g., Lieber v. Village of Spring Valley,* 40 F.Supp.2d 525, 532–34 (S.D.N.Y.1999); *Douglas v. County of Tompkins,* No. 90 Civ. 841, 1995 WL 105993,*5 (N.D.N.Y. Mar. 2, 1995); *Jones v. City of New York,* 161 A.D.2d 518, 555 N.Y.S.2d 788 (N.Y.App. Div. 1st Dep't 1990). The Court agrees with this line of reasoning and finds that sufficient evidence was presented here of actions by Kissik, Edelman and Witkowich within the longer limitations period that could constitute intentional infliction of emotional distress.

■ Additionally, with respect particularly to Gonzalez's claims against Kissik involving actions that occurred prior to May 21, 1995—a date corresponding to the beginning of the one-year and ninety-day period preceding her August 21, 1996 complaint—Gonzalez may "invoke the continuing tort doctrine to provide an exemption from the statute of limitations where the 'last actionable act' of the alleged course of conduct falls within the statute of limitations." *See Bonner v. Guccione,* 916 F.Supp. 271 (S.D.N.Y.1996); *Neufeld v. Neufeld,* 910 F.Supp. 977, 982–83 (S.D.N.Y.1996).

### 3. *Sufficiency of Claims*

■ The City next argues that, as a matter of law, an intentional infliction of emotional distress claim may not lie against any of the City Defendants based on the facts presented in this case. As the Court instructed the jury, a person may be liable for intentional infliction of emotional distress when he "intentionally and for the purpose of causing severe emotional distress conducts himself towards another person in a manner so shocking and outrageous that it exceeds all reasonable bounds of decency." *See* Tr. at 3306.

■ The tort has four elements: (1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress. *See Howell v. New York Post Co.,* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 612 N.E.2d 699, 702 (1993). New York sets a high threshold on conduct that is "extreme and outrageous" enough to constitute intentional infliction of emotional distress. *See Murphy v. American Home Prods. Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86, 90 (1983).

Nonetheless, in the Second Circuit's assessment of New York law, conduct that included acts such as those Gonzalez asserted here might well be considered sufficiently outrageous to satisfy the conduct element of the emotional distress tort. *See Bender v. City of New York,* 78 F.3d 787, 791 (2d Cir.1996) (fact that police officer struck plaintiff and then filed false charge that plaintiff assaulted him, resulting in 24 hours of imprisonment without reasonable cause, held sufficiently outrageous to satisfy the conduct element of the emotional distress tort); *Hughes v. Patrolmen's Benevolent Ass'n of City of New York,* 850 F.2d 876, 883 (2d Cir.1988) (campaign of police harassment held sufficient to constitute intentional infliction of emotional distress); *Mejia v. City of New York,* 119 F.Supp.2d 232, 285 (E.D.N.Y. 2000) (evidence that a police officer was involved in a scheme to fabricate charges against plaintiffs and ordered one of them to be strip-searched, held sufficient to defeat summary judgment on claim of intentional infliction of emotional distress); *Levine v. Gurney,* 149 A.D.2d 473, 539 N.Y.S.2d 967, 968 (N.Y.App. Div.2d Dep't 1989) (false complaint filed by police officer against plaintiff where the officer may have had personal motives for making the charges held sufficient to withstand summary judgment on a claim of intentional infliction of emotional distress).

The Court concludes that, under this strict standard, and based on the evidence in the trial record, a reasonable, fair-minded jury could find that Kissik, Witkowich and Edelman intentionally inflicted emotional distress upon Gonzalez. The Court further finds that the jury could reasonably have determined that Gonzalez's injuries and causation were sufficiently established by the evidence, including the testimony of Gonzalez's psychiatric expert.

The evidence, as presented by Gonzalez and credited by the jury, indicates a per-

sonal campaign of adverse actions directed by Kissik and designed not only to silence Gonzalez and punish her for complaining of harassment, but also to make work conditions intolerable enough so as to cause her to resign from the police force or to malign her enough to result in her termination. In the Court's view, the type and extent of the conduct detailed, deriving from a high-ranking police precinct commander and aimed at a junior officer, suffice to meet the elements of an intentional infliction of emotional distress claim against Kissik.

Kissik's misconduct did not entail a mere isolated incident, but was sustained over a period of months spanning Gonzalez's two tours of duty at the 50th Precinct, assignments separated by approximately the one year that Gonzalez spent at the Bronx Court Section following her transfer there at Kissik's direction. Moreover, the distress Gonzalez claimed she suffered entailed not just the mortifications of unrelenting petty harassment, but on at least one occasion having been ordered out of the Precinct on patrol without proper equipment, which Gonzalez stated made her feel that her personal safety and that of the public were placed in danger. *See* Tr. at 231; 979. The jury's finding is further supported by Alvarez's testimony that Kissik not only ordered officers working under him to "ride Gonzalez" but also coordinated his efforts to oust her with high-ranking officials in the NYPD's top echelons.

Gonzalez's claim that Edelman was guilty of intentional infliction of emotional distress is similarly sustainable. According to Gonzalez's trial testimony which the jury could reasonably have credited, Edelman, like Kissik, took numerous actions that caused Gonzalez to be suspended multiple times and created a distorted record to make her appear insubordinate and ir-

responsible, all the while treating her disdainfully and ignoring her legitimate medical complaints. The record also contains evidence that Edelman, who did not appear at the trial, acted under orders to return Gonzalez promptly to work even when she complained of illness she felt rendered her unprepared to perform her police duties.

Such conduct, attributed to a physician who served as head of the NYPD's medical services, can impact an individual with particular emotional severity. If, as the jury may have believed, Edelman, whether on his own or influenced by higher commands, returned Gonzalez to work when she may not have been medically fit, his conduct could have placed Gonzalez's health or safety at greater risk. On this record, it is conceivable that a reasonable jury could have understood that such intimidating and negative treatment from Gonzalez's assigned medical officer at the NYPD would be intended to cause Gonzalez severe emotional distress as defined by law.

Finally, Gonzalez produced evidence supporting her claim that Witkowich, aware of who Gonzalez was when she was brought to his Precinct, and motivated by specific retaliatory animus toward Gonzalez, detained her unreasonably; prolonged her detention by forcing her to undergo unnecessary and humiliating examinations; and caused unwarranted criminal charges to be brought against her. On this trial record, a reasonable jury could find that such conduct could sufficiently support a claim for intentional infliction of emotional distress. *See, e.g., Bender,* 78 F.3d at 791; *Mejia,* 119 F.Supp.2d at 285; *Levine,* 539 N.Y.S.2d at 967.

## B. *RETALIATION*

██ The elements of a retaliation claim for Title VII purposes require the plaintiff

to establish that (1) the employee engaged in protected activity known by the defendant; (2) an adverse employment action was taken against the plaintiff; and (3) a causal connection existed between the protected activity and the adverse employment action. *See Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir.1991).

City Defendants challenge the verdict on Gonzalez's retaliation claim insofar as the jury found that Witkowich's conduct constituted employment retaliation. They argue that Witkowich's actions occurred after Gonzalez had left the NYPD and that any information he received about her was based on alleged reports from other officers. Under these circumstances, City Defendants contend that Witkowich's actions cannot, as a matter of law, constitute adverse employment actions.

Retaliatory deeds by an employer against a former employee may be actionable under Title VII. *See Robinson v. Shell Oil*, 519 U.S. 337, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); *Pantchenko v. C.B. Dolge Co.*, 581 F.2d 1052, 1054–55 (2d Cir. 1978). The directness with which adverse employment actions must affect a complainant's employment has been the subject of significant disagreement among the courts. Some cases suggest that the adverse actions at issue must have directly resulted in a loss of a job opportunity or benefit. *See Sarno v. Douglas Elliman–Gibbons & Ives, Inc.*, 183 F.3d 155 (2d Cir.1999). Others indicate that losses attributable to retaliatory actions need not interfere with a particular job where they impede specific employment objectives. *See, e.g., Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 466 (2d Cir.1997) (citing *Pantchenko*, 581 F.2d at 1054) (sullying the reputation of a terminated employee may be considered a retaliatory action when it affects an employee's tangible fu-

ture objectives); *Passer v. American Chem. Soc'y*, 935 F.2d 322, 330 (D.C.Cir. 1991) (finding that the cancellation of a major public symposium scheduled to honor a former employee may qualify as an act of retaliation).

Based on both the language and history of Title VII, this Court is of the view that the sort of retaliatory conduct that would naturally create major obstacles for a former employee in obtaining future employment in her field is actionable under this statute. *See* 42 U.S.C. § 2000e–3. In particular, based on the facts in the record, Witkowich's involvement in the NYPD's initiating against Gonzalez a felony charge of criminal impersonation of a police officer—although there was doubt as to whether in fact Gonzalez represented to the arresting officer that she was currently a police officer—can be considered an adverse action against Gonzalez that would unquestionably impact negatively her subsequent ability to obtain gainful employment. *See, e.g., Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 157–58 (3d Cir.1999) (post-employment actions by an employer, including threats to file a civil lawsuit, "can constitute discrimination under Title VII if they hurt a plaintiff's employment prospects"); *Berry v. Stevinson Chevrolet*, 74 F.3d 980 (10th Cir.1996); *see also Beckham v. Grand Affair of N.C.*, 671 F.Supp. 415, 419 (W.D.N.C.1987) (arrest at direction of employer was held actionable under Title VII).

As regards the retaliation claims against Kissik and Edelman, the evidence presented to the jury indicated that both defendants continuously took actions which manifested intention or produced the effect of making employment at the NYPD intolerable for Gonzalez. In light of the testimony that Kissik singled Gonzalez out for

heavy-handed supervision, causing disciplinary actions to be instituted against her even for minor violations; that he caused her assignments to be changed regularly and abruptly; and that he was responsible for her transfer to a location where she would be perceived and treated as an officer with performance problems, Kissik could be considered to have taken adverse employment actions. *See Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 443–44 (2d Cir.1999) (corrections officer's transfer to a less desirable position where she would be in contact with prisoners held to constitute adverse employment action); *de la Cruz v. New York City Human Res. Admin.*, 82 F.3d 16, 21 (2d Cir.1996); *Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1254–55 (2d Cir.1987) (noting that retaliation could occur in the form of direct and heavy-handed supervision); *Boyd v. Presbyterian Hosp.*, No. 95 Civ. 3847, 2001 WL 314655, *8 (S.D.N.Y. Mar. 30, 2001) (holding that a transfer may be considered an adverse employment action under Title VII when it represents a significant change in the nature of an employee's work); *Meckenberg v. New York City Off–Track Betting*, 42 F.Supp.2d 359, 378 (S.D.N.Y.1999); *Dortz v. City of New York*, 904 F.Supp. 127, 156 (S.D.N.Y.1995) (indicating that, because increased supervision could disadvantage and interfere with an employee's ability to perform her job, it could constitute adverse employment action).

Moreover, given the evidence provided by Alvarez that Kissik engaged in a continuing pattern of causing disciplinary charges to be written against Gonzalez, and that Kissik coordinated his efforts with other high-ranking officials in the NYPD in order both to portray Gonzalez as insubordinate and a troublemaker and to encourage her to leave the NYPD, Kissik's actions could constitute employment retaliation not only under federal law, but under the HRLs as well. *See, e.g., Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir.1998); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir.1997) (filling an employee's records with reprimands and negative reports constituted an adverse employment action that could seriously affect the employee's position); *Sims v. MME Paulette Dry Cleaners*, 580 F.Supp. 593 (S.D.N.Y.1984) (changing employee's reporting time and singling her out for written warnings and monitoring).

The evidence presented also supports a finding that Edelman took actions against Gonzalez that would be materially adverse to the terms and conditions of Gonzalez's employment. According to Gonzalez, Edelman brought baseless disciplinary charges against her numerous times after she filed her EEOC complaint and misrepresented the hours when he ordered her to report back to work. As a consequence, Gonzalez was marked Absent Without Leave when she reported to work at the wrong time. The various disciplinary charges Edelman brought against Gonzalez resulted in her continual suspensions without pay for several weeks. These actions produced adverse effects on Gonzalez's employment in creating negative records as to her reputation on the job; her ability to perform her duties effectively; and her compensation. *See Dominic*, 822 F.2d at 1254–55; *Osier v. Broome County*, 47 F.Supp.2d 311, 325–26 (N.D.N.Y.1999); *Romero v. Howard Johnson Plaza Hotel*, No. 97 Civ. 3706, 1999 WL 777915, *7 (S.D.N.Y. Sept. 28, 1999).

## C. *CONSTRUCTIVE DISCHARGE*

■ To sustain a claim of constructive discharge, Gonzalez had to establish that the City Defendants intentionally subjected her to an objectively intolerable working environment that forced her to quit involuntarily. *See Chertkova v. Connecti-*

cut *Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.1996). Working conditions are intolerable if they are "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id.* (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977)).

■ At trial, Gonzalez produced evidence that she was subjected to an unreasonable level of scrutiny, excessive hostility and unmerited disciplinary charges against which she continually had to defend. The Court finds that these actions were sufficiently severe and sustained to make working conditions intolerable for any reasonable person in Gonzalez's position. Gonzalez described the circumstances of her signing a resignation form on April 23, 1996 before the start of the departmental trial on disciplinary charges against her, based in particular on her refusal to submit to the Dole Test. Gonzalez testified that she was told she would be fired after the proceeding and that she would have to sign the form in order to be allowed to resign rather than being fired for cause.

■ Defendants Kissik and Edelman argue that they had no part in Gonzalez's claimed constructive discharge or resignation because they had had no supervisory role or contact with Gonzalez for several months prior to her resignation and were not involved in the NYPD's decision to order the Dole Test. This argument assumes that the claimed constructive discharge was grounded on a single event and that the relative roles the various City Defendants played in it can be disaggregated and examined in isolation.

The evidence that Gonzalez presented, and the jury must have credited, indicated that the circumstances relating to her resignation in April 1996 were the culmination of a concerted effort on the part of the NYPD to cause Gonzalez's departure from the force, voluntary or otherwise. The incident concerning the Dole Test was but one component of the larger campaign Gonzalez asserted that encompassed a continuous pattern and practice spanning over two years and in which both Kissik and Edelman played significant parts. That these City Defendants were not present to see the end of the chain of events in which they were substantially involved and helped propel should not break their causal link and consequential responsibility for related effects they put in motion.

■ The argument that Gonzalez's claimed involuntary resignation was temporally too remote from the individual defendants' actions also must be rejected. The passage of time by itself is not dispositive in a constructive discharge claim. *See, e.g., Shull v. Rite Aid Corp.*, No. 94 Civ. 8552, 1997 WL 289460, *8, n. 4 (S.D.N.Y. May 30, 1997); *Barbetta v. Chemlawn Servs. Corp.*, 669 F.Supp. 569, 572 (W.D.N.Y.1987). Rather the question of whether the temporal relationship between the forced resignation and the harassment is too distant is a matter properly left to the trier of fact. *See Dortz*, 904 F.Supp. at 160.

Sound reasons support rejection of City Defendants' contention in favor of this approach. Not every employee whose work environment is rendered utterly intolerable by harassment and purposeful actions of the employer—motivated to force a resignation—may be in a position to walk out immediately upon the first major incident or even following an accumulation of incidents. People vary in their resilience to humiliation and thresholds of pain. Moreover, multiple pushes and pulls may come to bear upon a person's choice of whether or when to resign from employment. Financial constraints, protection of professional standing, the time it may require to

line up other employment, institutional loyalties, and even deeply personal, emotional reasons may operate to render an immediate departure inopportune, even against the pressure of unpleasant working conditions.

For these reasons, while the bar marking who is entitled to relief for constructive discharge should not be lowered to the breaking point of the thinned-skinned or impulsive, neither should it be raised to penalize fortitude and endurance. That an employee may choose to suffer abuse a little longer until either an auspicious moment arrives or the particular individual's capacity to tolerate maltreatment is finally exhausted, may signal an absence of immediate options, or even an abundance of patience and tenacity, rather than acceptance of harassment as a way of life or as a normal condition of employment. Thus, an employee being shown the door by backhanded means should not be required to exhibit fresh boot marks on her back on the date of departure as the only way to prove that the employer made her feel unwanted and unwelcome.

## D. *UNREASONABLE DETENTION*

■ Witkowich challenges the jury's verdict finding him liable on Gonzalez's Fourth Amendment claim for unlawful seizure. He contends that there was no evidence that the 27–hour delay Gonzalez experienced after her arrest was unreasonable and that he took no actions which unduly delayed her arraignment or release. Witkowich also contends that there was no basis for his liability for false imprisonment under state law because probable cause existed for Gonzalez's arrest in connection with the traffic offense.

■ As a preliminary matter, Witkowich asserts that Gonzalez failed to plead a claim of unlawful seizure in that she indicated nothing more in her pleadings than

that she was detained for 27 hours, without specifying which individual was responsible or alleging that the duration of this detention was unreasonable. The Court disagrees. Gonzalez's pleadings and trial submissions allege violations of her Fourth Amendment rights arising out of the events in question. In her Joint Pre–Trial Order, Gonzalez stated that her Fourth Amendment claims included a claim for excessive detention. Thus, Witkowich had ample notice of Gonzalez's claim for unlawful detention and could not have been prejudiced by its submission to the jury. To the extent Gonzalez's pleadings may have been deficient in any way in this regard, the Court deems them amended to conform to the proof in accordance with Fed. R.Civ.P. 15(b). *See Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94 (2d Cir.2000).

The Court also finds no merit in Witkowich's argument that Gonzalez offered no evidence concerning the unreasonableness of her 27–hour detention. Witkowich cites *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) for the proposition that a plaintiff bears the burden of showing that a delay of less than 48 hours between arrest and arraignment is unreasonable. But the Supreme Court there also specifically cited as examples of unreasonable delays "a delay motivated by ill will against the arrested individual, or delay for delay's sake." *Id.* at 56, 111 S.Ct. 1661. In the case at hand, Gonzalez's theory was that any excessiveness in her detention was motivated by Witkowich's ill-will. This Court so charged the jury. The Court believes the record contains sufficient evidence to support a reasonable jury's determination as to this claim.

Gonzalez testified that when she arrived at the 40th Precinct on the day of her arrest, she recognized a police officer with whom she had worked at the 50th Precinct;

that she saw the officer heading in the direction of Witkowich's office; and that shortly thereafter Witkowich emerged to exert control over the situation. Nell's testimony indicated that, not only at the 40th Precinct but at the other police facilities to which he traveled with Gonzalez that day in connection with the processing related to her arrest, he heard derogatory comments from members of the force and expressions of recognition of Gonzalez as a former police officer who had brought legal actions against the City. *See* Tr. at 1733–35; 1755–56.

Witkowich was present during portions of the commotion that occurred when Gonzalez was brought into the 40th Precinct and, according to Nell, acknowledged knowing about Gonzalez's forced resignation from the NYPD. *See* Tr. at 1665. The jury could reasonably infer from this evidence that Witkowich was aware of Gonzalez's background and that his conduct in connection with the events related to Gonzalez's detention, criminal charges and arraignment could have been colored by her prior history and complaints against other officers.

The evidence points to no persuasive explanation or basis for Witkowich's order to subject Gonzalez to a breathalyzer test, particularly in the face of the testimony of Nell, who was the arresting officer at-the-scene; who had served as a member of a DWI Unit; and who testified that he had observed *no signs or symptoms* that Gonzalez was driving under the influence and that he would not have required her to take the DWI test. The jury heard testimony of an informal NYPD practice under which normally a former member of the police force stopped for a traffic offense is not issued a summons and that it would be an extraordinary event for such an officer to be hauled to the Precinct and placed

under arrest for such an infraction. *See* Tr. at 1757–59.

The videotape of the DWI test, which the jury viewed and which required transporting Gonzalez to another Precinct where the necessary equipment and trained staff for the procedure were located, not only established quantitatively that Gonzalez's alcohol test measured zero, but demonstrated convincingly that in other respects she was fully in control of her faculties. On this basis, fair-minded jurors could reasonably have concluded that Witkowich's reasons for subjecting Gonzalez to the DWI test were motivated by ill will: to humiliate her, prolong her detention and cause her greater emotional distress.

For similar reasons, the jury could have concluded that other events at the 40th Precinct that had the effect of extending Gonzalez's detention could not be reasonably justified by the needs of ordinary police procedures. Witkowich ordered Gonzalez to undergo a strip search, the necessity for which also appeared doubtful. Witkowich's additional order that Gonzalez be charged with criminal impersonation, which Nell testified he would not have filed but for Witkowich's order, required some additional processing on a more fundamentally serious accusation.

Cumulatively, all of these circumstances added to delays in Gonzalez's arraignment and prolonged her detention. The jury could have determined that the process and its duration were out-of-the-ordinary and could have been prompted by Witkowich's personal animus. City Defendants did not explain why Gonzalez was not promptly taken to the NYPD's Central Booking after she was returned to the 40th Precinct after the DWI test. The evidence indicates that, partly on account of these other doubtfully grounded charges and procedures, the NYPD waited until nearly midnight to transfer Gonzalez to Central

Booking, a time when it was certain she would have to be detained overnight. There was also testimony indicating that the last opportunity to present Gonzalez before a judge for arraignment would have occurred between 9:00 p.m. and 11:00 p.m. *See* Tr. at 1746.

Arguing that the length of Gonzalez's detention was not unusual, Witkowich cites the testimony of one of the original defendants, Jeffrey Mishula, who asserted that in Bronx County in 1996, the average processing time from arrest to arraignment was 27 hours. He further contends that the record contains no other evidence establishing what constituted normal processing. Mishula's testimony should be considered in the context of the New York Court of Appeals's holding in 1991 that, for purposes of the New York arraignment statute, N.Y. Criminal Procedure Law § 140.20, processing time exceeding 24 hours is unreasonable. *See People ex rel. Maxian v. Brown,* 77 N.Y.2d 422, 568 N.Y.S.2d 575, 570 N.E.2d 223, 225 (1991).

With respect to Witkowich's assertion that there was no other testimony as to what constituted a normal period from arrest to arraignment, Witkowich himself and other defense witnesses testified that under NYPD manuals, the time it ordinarily should take to process an arrestee from the point of transfer from the precinct to Central Booking is three hours. Gonzalez, who was brought to the 40th Precinct at around 4:30 p.m., was held for approximately eight and one-half hours before she was transported to Central Booking. In fact, as regards the desk appearance ticket Gonzalez was issued in connection with her arrest, the evidence indicated that the normal procedure was to release the subject within no more than two hours after arrest.

The Court concludes that a reasonable jury could have found from the trial evidence that Gonzalez's DWI test, strip search and criminal impersonation charge—all of which were traced to Witkowich's orders—were of doubtful basis and that these actions could have been intended by Witkowich to extend Gonzalez's detention unreasonably and cause her other harm.

Witkowich also claims that he cannot be held liable for Gonzalez's unlawful seizure or false imprisonment because there was probable cause for the traffic law violations for which she was arrested. In this connection, the Court distinguished Gonzalez's claims for false arrest, which it did not submit to the jury, from her unreasonable seizure and false imprisonment claims. The Court's determination rested on *Lauro v. Charles,* 219 F.3d 202, 212 (2000).

*Lauro* confirms that the "fact that [the plaintiff] was lawfully under arrest when these events occurred does not mean that no Fourth Amendment interest [of plaintiff's] was implicated." *Id.* The Second Circuit rejected the notion that the protections against unreasonable seizures are inapplicable to persons lawfully in police custody, noting that "[r]ather, the Fourth Amendment shields arrestees from police conduct that unreasonably aggravates the intrusion on privacy properly occasioned by the initial seizure." *Id.* The doctrine in *Lauro* accords with New York case law holding that, even if an initial arrest is valid, a claim for false imprisonment lies under state law if a plaintiff is thereafter unreasonably detained. *See, e.g., Kelly v. State of New York,* 105 A.D.2d 905, 482 N.Y.S.2d 70, 71 (N.Y.App. Div.3d Dep't 1984); *Lewis v. Counts,* 81 A.D.2d 857, 438 N.Y.S.2d 863, 864 (N.Y.App. Div.2d Dep't 1981); *see also Mahase v. City of New York,* No. 96 Civ. 6105, 2000 WL 263742, *4 (E.D.N.Y. Jan. 5, 2000).

 City Defendants argue that the Court should have charged the jury as to what is "unreasonable", but they never offered such a charge nor objected to the charge on that ground before it was given to the jury. To this extent, the objection was waived.

### E. UNLAWFUL SEARCH

 The jury found Witkowich liable on Gonzalez's claim of unlawful search of her person. Witkowich denies having ordered the strip search Gonzalez alleged Officer McDermott conducted on her at the 40th Precinct and contends that he had no personal involvement in any search of Gonzalez. McDermott testified that Witkowich told her to escort Gonzalez to the bathroom and perform a search. Witkowich, however, offered no persuasive explanation of what circumstances could reasonably have justified a search of Gonzalez for weapons or contraband. *See Weber v. Dell*, 804 F.2d 796, 802 (2d Cir.1986) ("[T]he Fourth Amendment precludes ... officials from performing strip/body cavity searches of arrestees charged with misdemeanors or other minor offenses unless the officials have a reasonable suspicion that the arrestee is concealing weapons or other contraband based on the crime charged, the particular characteristics of the arrestee, and/or circumstances of the arrest."); *see also Wachtler v. County of Herkimer*, 35 F.3d 77, 81 (2d Cir.1994).

The lawful arrest incident to which the search would have been conducted was a routine traffic infraction. Although there was testimony that Gonzalez behaved boisterously when brought into the Precinct, the jury could reasonably have concluded that City Defendants offered no persuasive indication that she posed a security threat or that grounds existed for reasonable suspicion that she may have possessed a weapon or contraband on her person. The

evidence established that Gonzalez was wearing jogging shorts and a loose shirt which would readily have revealed any hidden weapons or materials on her person. A reasonable jury could have concluded from this record that escorting Gonzalez away to the bathroom for the purpose of a search could be suggestive of a judgment that, whether or not the circumstances warranted a broader body search, she had to be made to disrobe fully. From these circumstances a jury could reasonably have inferred that, given Witkowich's commanding role in the Precinct, he directed the procedure McDermott carried out, which could have included the strip search Gonzalez claimed occurred.

The Court finds no basis for Witkowich's argument that he had no personal involvement in the strip search. In this connection, the particular defense Witkowich asserts warrants pointed consideration. He contends that any remedy Gonzalez may have for the alleged unlawful strip search would lie not against him, but against McDermott, the officer who actually carried out his order to perform the search the jury found unreasonable.

This argument is familiar. Each time it is heard it raises the same fundamental issues, often inducing profound tremors of concern when pronounced by high ranking public authorities. The defense is officialdom's way of saying "The Butler did it", and then erecting a now infamous circle of pointing fingers in an effort to wall off accountability for misdeeds in high places. Behind the barricades, the commanders, if they acknowledge that any wrong occurred at all, play out a well-worn script, typically shifting blame to indistinct powers-that-be above, or, more likely, to subordinates below. The underlings in turn defend that they did nothing but serve as pawns, merely following orders of distant authorities known or unknown—the same commands

the chiefs deny they uttered. And so, the argument holds, no one shamed in this circular chain of blame may be held liable for grievous wrongs that never happened, though their corporeal reality is all too manifest and painful.

The dangerous lengths to which this line of defense is sometimes taken, as well as the dark regions on which it may border, were all definitively exposed in the judgments at Nuremberg. For the reasons there so tragically witnessed, longstanding safeguards against misuse of executive prerogatives to push blame up and down official ranks in order to diffuse culpability have been embodied in our civil rights jurisprudence.

 Although generally a defendant's personal involvement in a claimed deprivation of rights must be established, the requirement may be met in circumstances, such as those evidenced here, where the unlawful conduct was carried out by a subordinate acting under direct instructions of a principal violator who possessed the wrongful intent to cause the denial of the complainant's civil rights. *See Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (A supervisory official may be liable if he or she "directly participated in the infraction" or "created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue."); *Meriwether v. Coughlin,* 879 F.2d 1037, 1046 (2d Cir. 1989); *cf. Varrone v. Bilotti,* 123 F.3d 75 (2d Cir.1997); *see also Conner v. Reinhard,* 847 F.2d 384, 397 (7th Cir.1988) ("the requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or should have known would cause others to deprive the plaintiff of her constitutional rights."); *Specht v. Jensen,* 832 F.2d 1516, 1524 (10th Cir.1987).

Here, the jury was entitled to sort out and resolve the conflicting details in the different versions of the facts and decide which account struck it as more credible. The Court concludes that, in the context of all the facts in the trial record, fair-minded persons reasonably could have chosen to discount Witkowich's denials and credit Gonzalez's allegations with regard to her unlawful search claim.

## F. STATUTORY CAP ON COMPENSATORY DAMAGES

 City Defendants argue that federal law imposes a $300,000.00 cap on the damages the jury could award in a Title VII action for compensatory damages, including front pay, and that Gonzalez is not entitled to an award exceeding the applicable statutory maximum. *See* 42 U.S.C. § 1981a(b)(3). According to the weight of authority among courts which have examined the issue, front pay is not included within the § 1981a(b)(3) cap on compensatory damages. *See Martini v. Fed. Nat'l Mortg. Ass'n,* 178 F.3d 1336, 1338–49 (D.C.Cir.1999), *cert. denied,* 528 U.S. 1147, 120 S.Ct. 1155, 145 L.Ed.2d 1065 (2000); *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 555–56 (10th Cir.), *cert. denied,* 528 U.S. 813, 120 S.Ct. 48, 145 L.Ed.2d 42 (1999); *Kramer v. Logan County School Dist.,* 157 F.3d 620, 625–26 (8th Cir.1998); *Rivera v. Baccarat, Inc.,* 34 F.Supp.2d 870, 877–78 (S.D.N.Y.1999).

City Defendants' reliance on *Hudson v. Reno,* 130 F.3d 1193 (6th Cir.1997) is misplaced. That decision not only runs counter to the trend of subsequent case law in other circuit courts, but its continued vitality was recently cast into doubt by another panel of the Sixth Circuit which questioned the soundness of *Hudson. See Pollard v. E.I. DuPont de Nemours Co.,* 213 F.3d 933, 945 (6th Cir.2000). This Court therefore rejects City Defendants' argument

that § 1981a(b)(3) caps front pay awards. The Court aligns its holding in the instant case with the courts which have decided otherwise.

■ In any event, New York's HRL, under which Gonzalez's claims also are brought, does not contain such a cap. As numerous courts in this Circuit have found, jury awards should generally be "allocated under the liability theory that provides plaintiff the most complete recovery." *Funk v. F & K Supply, Inc.,* 43 F.Supp.2d 205, 225 (N.D.N.Y.1999) (citing cases). When claims arising under both Title VII and New York's HRL are at stake, compensatory damages may be recoverable as provided in the HRL, while punitive damages are determined according to the limits of Title VII, which allows for such damages where the HRL does not. *See id.* at 226 (noting that this approach was consistent with that employed by the Second Circuit in *Magee v. U.S. Lines Inc.,* 976 F.2d 821, 822 (2d Cir. 1992)); *Anderson v. YARP Rest., Inc.,* No. 94 Civ. 7543, 1997 WL 27043, **6–7 (S.D.N.Y. Jan. 23, 1997).

In this case, the jury returned a lump sum award predicated not only on Title VII and the HRLs, but also under state common law. This Court adopts the approach followed in *Funk* and finds that the compensatory damages awarded here may be allocated to the state law claims so as not to exceed, taking into account punitive damages, the statutory cap under Title VII.

## G. APPROPRIATENESS OF FRONT PAY/BACK PAY AWARDS

■ City Defendants next assert that Gonzalez is not entitled to an award of front pay or back pay. They argue that there was no evidence that Gonzalez would have continued as a police officer because, by virtue of disciplinary charges pending

against her, she would have been terminated in any case, and because Gonzalez herself had argued that she was disabled and unable to continue working as a police officer. These claims were not the subject of a pre-verdict motion by City Defendants, and thus are inappropriately raised at this time. In any case, the Court finds that the back pay and front pay awards are appropriate under the facts of this case.

City Defendants' assertion that there was no basis for the jury to assume that Gonzalez would have remained as a police officer because the departmental charges against her warranted her termination also raises fundamental issues bearing special consideration. The argument reflects an inverted logic that upends the symmetry of cause and effect. It omits to reckon that if in fact Gonzalez had no future at the NYPD by reason of her disciplinary record relevant to this case, such a circumstance could have been a by-product of the wrongful retaliatory acts City Defendants had taken against her precisely for the purpose of insuring that Gonzalez's career as an officer was short-lived.

In considering Gonzalez's future employment prospects at the NYPD, a reasonable jury could have found that a substantial portion, if not all, of the disciplinary charges brought against Gonzalez issued from City Defendants' retaliatory motives and formed components of the larger campaign instigated or fostered by them intended to oust her from the force. The jury could have found sufficient evidence to support Gonzalez's contention that, had the NYPD's concerted retaliatory campaign not been mounted against her, many of the disciplinary charges she faced may not have been filed in the first place and thus that the NYPD would not have had a sufficient basis to justify terminating her.

Equally fundamental, moreover, at the time of her resignation, although Gonzalez faced a trial on some of the administrative charges then pending against her, in fact, she had not been terminated because the charges were never adjudicated. Nowhere in our concept of justice does an accusation by itself equate to a final judgment of guilt. That internal charges, however serious, had been filed against Gonzalez does not inevitably mean that at the departmental trial the accusations would have been found sufficient; that termination of employment would have been the ineluctable outcome of the proceedings; that all administrative appeals would have proved futile; or that in the final analysis, if challenged in court, the NYPD's actions would have survived the rigorous scrutiny of an adversarial proceeding under more exacting standards of judicial review.

The jury and the Court are entitled to entertain the notion that these alternative outcomes represent more than illusions and that any one of them holds out as much reasonable prospect of realization as City Defendants' preordained premise. Weighing these other contingencies in the mix reflects a preferable outlook to accepting City Defendants' deterministic predicate, for this option expresses faith in our system of justice and reaffirms hope in the ultimate triumph of fair play.

On the other hand, to suppose, as argument necessarily implies, that because Gonzalez faced serious disciplinary charges the jury therefore must infer as fact that she had no future remaining at the NYPD, is essentially to prejudge the outcome of the NYPD's administrative proceedings and to condemn the charges and trials comprising that adjudicatory process as tantamount to nothing more than a proforma travesty staged to feign due process. If this argument indeed conveys City Defendants' considered judgment of their own agency's notion of justice, the jury could have properly rejected it.

With respect to Gonzalez's application for disability benefits, the filing would not necessarily have precluded Gonzalez from working at the NYPD, given that she was not found disabled. Even with a disability, she might have been able to continue working with some accommodation. The jury did not consider Gonzalez to have been disabled because the issue was not presented to it, and the Court does not find that Gonzalez could be treated as disabled as a matter of law.

■■■ In the context of discrimination on the basis of disability under the Americans with Disabilities Act (the "ADA"), which requires a plaintiff to demonstrate a capability for the work if an accommodation were provided, the Supreme Court has offered guidance which may have bearing on this issue. *See, e.g., Cleveland v. Policy Mgt.*, 526 U.S. 795, 805, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) ("if an individual has merely applied for, but has not been awarded, SSDI benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system."). The Supreme Court thus has found that significant latitude should be afforded to an ADA plaintiff who has had to argue at apparent cross-purposes in the event she has also sought disability insurance to which she may be entitled, which requires a plaintiff to prove an inability to work. *See id.*

City Defendants, in fact, suggested that Gonzalez's disability had been fabricated, which in itself would seem to acknowledge that Gonzalez's purported disabilities might not have prevented her from working until her maximum retirement age. This outcome would hold even if her physical injuries might have prevented her from continuing to perform as a police officer on

active duty, but not from working elsewhere in the NYPD.

City Defendants also contend that Gonzalez was unable to secure employment after August 1996, when she was arrested in connection with another criminal charge and that thus she should not recover front pay for that year. That Gonzalez was unable to secure new employment during that period does not indicate conclusively that she would have been unable to maintain employment at the NYPD during that time had she still been working there.

Based on the foregoing the Court thus concludes that City Defendants' motion for judgment as a matter of law must be denied.

## II. *MOTION FOR A NEW TRIAL*

█ The Court finds that the evidence Gonzalez presented is also sufficient to support the jury's findings and that the verdict is neither seriously erroneous or against the weight of the evidence. Although the City Defendants presented evidence that sharply conflicted with the accounts given by Gonzalez and Alvarez, many of the material aspects of Gonzalez's charges against Kissik, Edelman and Witkowich were not directly or persuasively controverted. By reason of the numerous contradictions in the respective accounts of the facts, the jury's findings necessarily rested on assessments of witnesses' demeanor and credibility and on what evidence the jury chose to credit.

Moreover, in the Courts' own appraisal of the trial record, there is sufficient direct and circumstantial evidence supporting Gonzalez's version of what occurred. Where conflicts of fact do exist in the trial record, the weight of the evidence does not tip the scales sufficiently in favor of the City Defendants so as to render the jury's findings unreasonable or clearly erroneous. In sum, on this record, the Court is not left with "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *DLC Mgt. Corp.*, 163 F.3d at 134.

## A. *THE COURT'S EVIDENTIARY RULINGS*

City Defendants cite numerous objections relating to the Court's inclusion or exclusion of contested testimony of various witnesses and of particular documentary evidence. The same objections were raised and ruled upon during the trial. The Court adheres to its earlier evidentiary rulings, the reasoning behind which was generally discussed in detail with the parties on the record.

█ A few specific points the City Defendants raise in their motion for a new trial—particularly relating to testimony of expert witnesses—bear some further comment. As a general matter, "a jury is presumed to comply with its instructions." *Bingham v. Zolt*, 66 F.3d 553, 564 (2d Cir.1995). There is no indication in this case that this presumption should not apply.

The jury patiently listened to the three weeks of testimony and to the Court's instructions on the law. Accordingly, the Court considers the jury to have adhered to its repeated instructions regarding the opinions of expert witnesses and the limitations pertaining to such testimony. On several occasions during the course of the trial, the Court instructed the jury that experts could testify based on their experience and expertise but that they were not qualified to render legal opinions and that they should not be understood to be so testifying. The Court also repeatedly told the jury to disregard any statement an

expert may make that the Court determined may be a conclusion of law.

■ City Defendants argue that the testimony of Alvarez and of Herbert Valdez, Gonzalez's expert witness, contained numerous legal conclusions. The Court disagrees. Mr. Valdez was allowed to testify as an expert on NYPD practices and procedures based on his knowledge and experience in law enforcement. The Court, however, established strict parameters on the matters Valdez was allowed to address and the format to guide his responses. On a number of occasions when Valdez approached straying beyond the marked boundaries, the Court sustained City Defendants' objections to particular testimony. Valdez was permitted to express only his specific knowledge of police practices and procedures and to indicate the extent to which application of particular practices or procedures at issue here may or may not have accorded with his understanding of them.

The Court does not consider the instances City Defendants cite as statements by Valdez of legal conclusions that told the jury what verdict to reach. Nor are the examples City Defendants cite of Valdez's and Alvarez's testimony concerning "reasonable suspicion" for the NYPD to order Gonzalez's Dole Test a matter that addressed an ultimate issue of fact in the case.

Concerning the alleged legal conclusions stated by Alvarez, the Court notes that Alvarez's testimony was not given as an expert, but as a fact witness familiar with certain processes of the NYPD's internal affairs investigations. The Court does not regard the matters Alvarez addressed to have been stated as legal conclusions.

B. *THE COURT'S INSTRUCTIONS TO THE JURY*

■ The Court finds no merit in City Defendants' argument that they are enti-tled to a new trial based on alleged errors in the instructions to the jury.

First, the Court's instruction advising the jury not to concern itself with the potential for double recovery was intended to highlight the difficulties the jury would encounter in determining a proper award of damages by reason of overlapping provisions of both federal and state laws involved in the case—Title VII, § 1983 and the City and State Human Rights Laws—and also under Gonzalez's claims for compensatory damages against multiple defendants covering pain and suffering, as well as front and back pay.

The charge placed the matter in context and reminded the jury that it could not award damages more than once for the same injury, nor permit Gonzalez to recover more than she lost. *See* Tr. at 3308–09. Moreover, the City Defendants did not object to this aspect of the instructions at the jury charge conference or during trial. Nor do they explain how the instruction prejudiced them to a degree entitling them to a new trial.

■ Second, City Defendants claim prejudice in the Court's allowing the parties to proceed to summation prior to the Court's final determination on the instruction regarding Gonzalez's Fourth Amendment claims. This was a matter that occupied lengthy discussions between the parties and the Court during which the proposed charge concerning this claim was substantially revised. At these numerous conferences, the Court gave the parties indications of the substance of the instructions it was inclined to give. The Court considers these disclosures sufficient to satisfy the standard of Fed.R.Civ.P. 51. *See Jones v. Southern Pacific R.R.*, 962 F.2d 447, 451 (5th Cir.1992); *Siddiqi v. Leak*, 880 F.2d 904, 911 (7th Cir.1989). In

fact, the instruction the Court ultimately gave reflected the omission of a charge opposed by City Defendants on Gonzalez's false arrest claim. Moreover, at City Defendants' request, made after the jury had begun deliberations, the Court called the jury back and added an instruction regarding the concept of reasonable suspicion.

 The Court has dealt previously with City Defendants' argument that Gonzalez was not entitled to a Fourth Amendment claim of unreasonable seizure on the ground that there was probable cause for her arrest on the traffic offense. The Court is satisfied that its instructions were consistent with applicable Second Circuit and New York State case law. *See* discussion, *supra.*

 City Defendants never raised the issue concerning the definitions of "unreasonable delay" or "strip search" during any of the charging conferences, nor did they express any request for instructions on these issues. Accordingly, these matters are deemed waived. *See Lavoie v. Pacific Press & Shear Co.,* 975 F.2d 48, 55 (2d Cir.1992) ("Failure to object to a jury instruction ... prior to the jury retiring results in a waiver of that objection."); Fed.R.Civ.P. 51 ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.").

 Finally, City Defendants offered no specific proposal, in the form expressed in the objection they now raise, to the constructive discharge instruction that the award could include lost compensation from the date of discharge to the present time. Moreover, the Court has addressed above the question concerning whether the jury reasonably could have assumed that Gonzalez could have remained employed by the NYPD.

The jury also presumably heard and heeded the several instructions the Court gave that statements by lawyers in questions and in closing arguments were not to be considered as evidence. Additionally, the Court believes that the jury was sufficiently instructed and understood the Court's charge that, in awarding damages, it was not to count any injury suffered by Gonzalez related solely to a second arrest about which the jury had heard little testimony.

### III. *AMOUNT OF DAMAGES AND REMITTITUR*

 City Defendants also have not demonstrated that the jury failed to consider all the evidence or acted contrary to the Court's instructions in determining damages, and the Court finds that a new trial on damages is not merited.[3] The basic principle for awarding compensatory damages is that an injury can be compensated only once. If two causes of action provide a legitimate basis for compensating one injury, only one recovery may be obtained. *See Bender,* 78 F.3d at 793 (citing court decisions in New York sustaining intentional infliction of emotional distress claims for conduct that is somewhat less than "utterly intolerable in civilized society"). In this case, the jury awarded a

---

**3.** With regard to the jury's award of front pay, the Court notes that the evidence presented to the jury by Gonzalez's economic expert concerning future lost wages explicitly indicated that the computation of losses Gonzalez claimed were discounted to present value.

*See* Tr. at 1618–23. Accordingly, the Court considered that the jury award already reflected a present value discount not requiring further adjustment. *See Oliveri v. Delta Steamship Lines, Inc.,* 849 F.2d 742, 746–48 (2d Cir.1988).

lump sum on all claims based on the damage it found Gonzalez suffered as a result of City Defendants' actions.

Taking into consideration the totality of the claims Gonzalez asserted, the severity of City Defendants' conduct, and the evidence of the injuries Gonzalez asserted she suffered on City Defendants' account, the Court does not find that the damages awarded in this case were excessive. New York courts have upheld damage awards within a similar range for a mental and emotional distress injury similar to that Gonzalez testified to and sufficiently supported at trial. *See, e.g., Ramirez,* 112 F.3d at 41, n. 1; *Bender,* 78 F.3d at 793; *New York City Transit Auth. v. State Div. of Human Rights,* 181 A.D.2d 891, 581 N.Y.S.2d 426 (N.Y.App. Div.2d Dep't 1992). Courts in other circuits have also sustained awards of comparable ranges. *See, e.g., Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322 (11th Cir.1999); *Koster v. Trans World Airlines, Inc.,* 181 F.3d 24 (1st Cir.1999).

City Defendants have not presented any argument or facts that compel a new trial in this matter, either on the substance of the claims or on the damages awarded. Accordingly, the motion for a new trial on damages or for remittitur is denied.

## IV. *PUNITIVE DAMAGES*

 Punitive damages may be awarded in an action under § 1983 "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); *Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir.1996).

The jury so found in this case as to Gonzalez's claims against Kissik, Edelman and Witkowich.

The Court believes that the trial evidence was sufficient to support the jury's determination as to each of these defendants. By agreement of the parties, the amount of any punitive damage award was left to the Court to determine, taking into account claims and the individual City Defendants financial resources.[4]

 In determining the amount of punitive damages, the Court must bear in mind that punitive damages must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Vasbinder v. Scott,* 976 F.2d 118, 121 (2d Cir.1992) (quoting *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)). To guide judicial application of the standards governing the reasonableness of punitive damage awards, the Supreme Court has enunciated relevant criteria including: (1) the degree of reprehensibility of a defendant's conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *See Lee,* 101 F.3d at 809 (citing *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)); *see also Mathie v. Fries,* 121 F.3d 808, 816 (2d cir.1997).

Among the considerations which the Supreme Court in *Gore* identified as "aggravating factors" that are "associated with particularly reprehensible conduct", rendering some wrongs more blameworthy than others, are whether a defendant's

---

4. To guide the determination of City Defendants' financial circumstance and ability to pay, the Court required Kissik, Edelman and Witkowich each to submit an affidavit detailing their individual incomes, assets and liabilities. These documents are included in the Court's record of this case.

conduct (1) was violent or presented a threat of violence; (2) involved deceit or malice as opposed to mere negligence; or (3) reflected repeated instances of misconducted. *See Gore*, 517 U.S. at 576–77, 116 S.Ct. 1589; *Lee*, 101 F.3d at 809.

Here, the evidence supports a finding that the relevant conduct of Kissik, Edelman and Witkowich was sufficiently reprehensible under these factors to justify imposition of punitive damages in an amount consistent with the underlying objectives of the award. All three individuals acted with malicious intent and brought to bear their official positions against Gonzalez in carrying out their wrongful conduct. *See Lee*, 101 F.3d at 811.

 The jury awarded substantial compensatory damages, totaling $1,250,000.00. A consideration to be weighed here in determining the appropriate ratio of punitive damages to the actual harm the jury found Gonzalez suffered is that while City Defendants may be jointly and severally liable for the award of compensatory damages, they may be entitled to indemnification from the City in accordance with § 50–k of the General Municipal Law. *See* N.Y. Gen. Mun. Law § 50–k (McKinney 1999). Accordingly, although in proportion to the compensatory damages award, the amount of punitive damages the Court imposes may fall within a range that may be deemed tolerable under applicable standards, in relation to City Defendants' actual financial exposure, any amount of punitive damages—for which the City Defendants represented to the Court the City of New York does not authorize indemnification—is likely to appear disproportionately high.[5] This consideration, however, is not decisive of the appropriate ratio in a § 1983 case; civil

rights violations may be considered "particularly egregious" acts for which punitive damages may be awarded even when compensatory damages are only nominal. *See Lee*, 101 F.3d at 811 (quoting *Gore*, 517 U.S. at 582, 116 S.Ct. 1589).

In *Lee*, to determine an appropriate amount of punitive damages, taking account of penalties for comparable misconduct upheld in other cases, the Second Circuit held that a punitive damages award in an amount of $200,000.00 against a police officer in connection with a verdict awarding nominal damages for use of unreasonable force and malicious prosecution was excessive. The Court ordered remittitur reducing the punitive damage award to $75,000.00. *See id.* at 813; *see also Mathie*, 121 F.3d at 816; *Ismail v. Cohen*, 899 F.2d 183, 186 (2d Cir.1990); *Hughes*, 850 F.2d at 883; *O'Neill v. Krzeminski*, 839 F.2d 9, 10 (2d Cir.1988). Plaintiff's detention in *Lee* lasted only a few hours, as compared in the case at hand to the sustained and repeated misconduct of Kissik and Edelman, and the much longer detention that occurred here attributable to Witkowich's actions. In *Lee*, however, unlike the instant case, defendants engaged in physical violence which required plaintiff to be sent to the hospital for cuts and contusions on his head. *See id.* at 808; *see also Hughes*, 850 F.2d at 883 ($175,000.00 in punitive damages against each of two defendants awarded to a plaintiff who was the victim of a campaign of police harassment); *King v. Macri*, 993 F.2d 294, 299 (2d Cir.1993) (plaintiff, jailed in pre-trial detention for two months as a result of malicious prosecution, awarded $150,000.00 on appeal, reduced from $250,000.00).

Taking into account all the circumstances in the case before the Court and

---

5. The Court has not relied upon the effect of City Defendants' entitlement to any indemnification in setting the amount of punitive dam-

ages at a level higher than it ordinarily would impose. *See Mathie*, 121 F.3d at 816; *Vasbinder*, 976 F.2d at 122.

applying the standards enunciated in the cases described above, the Court imposes punitive damages against the individual defendants—allocated to Gonzalez's federal claims—as follows: (1) Kissik: $25,000.00; (2) Edelman: $75,000.00; (3) Witkowich: $10,000.00.

## V. ATTORNEY'S FEES AND COSTS

 Gonzalez has applied for attorney's fees and costs pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1988. In federal civil rights actions, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). Gonzalez has accordingly submitted a request totaling $986,146.69, representing $874,911.00 to cover attorney's fees and $111,235.69 for costs. As the fee applicant, Gonzalez bears the burden of proving the reasonableness of the fees and costs she claims. *See Savoie v. Merchants Bank*, 166 F.3d 456 (2d Cir.1999).

On various grounds, City Defendants assert that Gonzalez's requested fees and costs are excessive and should be denied entirely or at least reduced significantly. As an initial matter, City Defendants contend that the rates Gonzalez's lawyers charged are not reasonable, characterizing much of the 2,925.4 hours they billed as "incredible." Defendants' Memorandum of Law in Opposition to Plaintiff's Application for an Award of Attorneys' Fees, dated May 25, 2001, at 3.

### 1. Attorney's Fees

At the outset, this Court notes that this case was vigorously contested by City Defendants from start to finish. In the approximately one and one-half-year period covered by the Gonzalez's attorneys' fee application, this matter was the subject of a motion for summary judgment, a three-week trial that was scheduled to last two weeks, and numerous post-trial motions and applications. At every stage of the proceeding, the City Defendants' lawyers, as was their right and professional duty, aggressively challenged Gonzalez's claims. In so doing, they displayed a fierceness matched in its intensity only by the double shock they now profess at the number of hours Gonzalez's attorneys assert they devoted to this case. Given that a substantial portion of these working hours are a direct function of the forcefulness and chosen strategies of the defense, this Court does not share City Defendants' general dismay about the size of Gonzalez's application for fees and costs.

 The first step for determining a reasonable fee is to calculate the "the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433–34, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The Second Circuit has held consistently that this amount (the "lodestar" amount) is strongly presumed to be reasonable. *See, e.g., Quaratino v. Tiffany & Co.*, 166 F.3d 422 (2d Cir.1999). The lodestar amount so determined may then be adjusted by a number of relevant factors, including the size of the firm and the adequacy of the documentation provided to support the particulars of the application. In determining the range of reasonable rates appropriate for the circumstances, the court may consider attorney's fees approved in comparable cases and apply its own knowledge of rates prevailing in the market for lawyers of reasonably comparable skills, experience and reputation. *See Blum v. Stenson*, 465 U.S. 886, n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d Cir. 1997).

The fees Gonzalez's attorneys seek range from $250.00 to $390.00 per hour for

the most senior and from $180.00 to $200.00 for the more junior lawyers. These attorneys practice in an eleven-lawyer firm located in Manhattan. After examining recent fee awards in civil rights cases in this District, the Court finds that these rates fall within the range of reason, although they are at the high end of the scale for a small firm. *See, e.g., Marisol A. v. Giuliani,* 111 F.Supp.2d 381 (S.D.N.Y.2000) ($375 per hour for lead attorney with extensive expertise in child welfare litigation, $350 per hour for attorneys with more than 15 years of experience, $300 per hour for attorneys with 10–15 years of experience, $230 to $250 per hour for attorneys with seven to nine years of experience); *Skold v. American Int'l Group, Inc.,* No. 96 Civ. 7137, 1999 WL 405539, at *7 (S.D.N.Y. June 18, 1999), *aff'd,* 205 F.3d 1324, 2000 WL 232031 (2d Cir.2000); ($400 per hour for experienced civil rights litigator who provided overall direction and strategy, $275 per hour for attorney who served as lead counsel, $225 per hour for attorney who served as co-lead counsel); *Rodriguez v. McLoughlin,* 84 F.Supp.2d 417, 421–23 (S.D.N.Y.1999) ($425 per hour for senior partner at large firm who was an experienced civil rights lawyer and $240 per hour for attorney at large firm with four years of experience).

The Court does note, however, that Gonzalez claims fees for services performed by eight different lawyers. For an eleven-attorney firm to have eight of its lawyers working on the same matter strikes this Court as somewhat unusual. While the bulk of the total hours Gonzalez's lawyers billed is attributable to the three senior attorneys most prominent in the case, and the services of the other five represent only a fraction of the whole, Gonzalez has not provided sufficient support to satisfy her burden of proving that the services of all of these attorneys were necessary and reasonable. On this account, the Court believes some reduction of the requested fees is appropriate.

■ The Court, however, disagrees with City Defendants' assertion that the lodestar amount should be reduced because the Court dismissed Gonzalez's gender discrimination claim and the jury did not sustain her hostile environment harassment claim. This Circuit holds that attorney's fees may be awarded for unsuccessful claims, as well as for successful ones, when they are " 'inextricably intertwined' and 'involve a common core of facts or [are] based on related legal theories'." *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1183 (2d Cir.1996) (quoting *Dominic v. Consolidated Edison Co.,* 822 F.2d 1249, 1259 (2d Cir.1987)). Given Gonzalez's success in her retaliation action, the lack of success on her other claims is not, in itself, a sufficient ground for reducing the lodestar amount.

■ Citing Judge Ward's reasoning in *Marisol A.,* the City Defendants urge that Gonzalez's claim for computerized research expenses is not recoverable. Although *Marisol A.* suggests that such expenses are not recoverable as "costs," (*see* 111 F.Supp.2d at 401), Second Circuit doctrine holds that such expenses are recoverable in an application for "attorney's fees." *See United States ex rel. Evergreen Pipeline Constr. Co. v. Merritt Meridian Constr. Corp.,* 95 F.3d 153, 173 (2d Cir.1996) ("[C]omputer research is ... compensable under an application for attorneys' fees and is not a separately taxable cost."); *Anderson v. City of New York,* 132 F.Supp.2d 239, 247 (S.D.N.Y.2001) (recognizing that although costs for computerized research are not taxable pursuant to 28 U.S.C. § 1920, "in this circuit they are considered as part of attorneys' fees, because, in theory, an attorney will complete a research assignment faster with the aid

of computerized databases than without such aides."); *accord Lawson v. City of New York,* No. 99 Civ. 10393, 2000 WL 1617014, at *5 (S.D.N.Y. Oct. 26, 2000).

### 2. Costs

 City Defendants additionally contend that many of the task entries in Gonzalez's application are vague, redundant, unrelated, inconsistent or otherwise excessive and unreasonable. The Court finds some merit in these objections. An amount of services associated with a related state court claim, as well as work attributable to Gonzalez's unsuccessful claim against the Police Benevolent Association ("PBA"), are included within the costs claimed here. While it is true that Gonzalez's PBA action arose out of some of the same core facts as those brought against City Defendants, the Court is of the view that the claims against the PBA, and the interests between City Defendants and the PBA, are sufficiently distinct that charging City Defendants for Gonzalez's unsuccessful claim against the PBA would be unreasonable.

 The Court concurs with some other deficiencies the City Defendants point to in Gonzalez's application. The per-unit costs for copying and faxing are not identified. The costs for such services and other expenses include charges associated with the litigation against the PBA. Travel time is not identified separately and billed at a lower rate.[6] "Miscellaneous" costs are not properly identified. And there is a substantial amount of "block billing" that renders it difficult to account properly for the expenses related solely to this matter.

Because of these ambiguities, and the inherent difficulties the Court would encounter in attempting to parse out reasonable costs and hours for appropriate tasks, the Court finds that a reduction of the fees and costs that Gonzalez claims is warranted. *See, e.g., Local 32B–32J, SEIU v. Port Auth.,* 180 F.R.D. 251, 253 (S.D.N.Y.1998) (reducing the requested attorney's fees by twenty percent due to vague descriptions in the time records); *Wilder,* 975 F.Supp. at 286 (reducing fee calculations by ten percent to account for vague time entries); *Meriwether v. Coughlin,* 727 F.Supp. 823, 827 (S.D.N.Y.1989) (reducing fee request by fifteen percent to account for vague entries). Having reviewed the documentation submitted in support of Gonzalez's application, and in accordance with prevailing standards and precedents in this District cited above, the Court reduces Gonzalez's request for attorneys' fees and costs combined by twelve percent to $867,809.09.

## VI. PREJUDGMENT INTEREST

 Gonzalez filed a post-verdict motion for an order amending the judgment so as to add prejudgment interest on the back pay and emotional pain and suffering portions of her jury award. The City Defendants filed no opposition to this request.

 In an action to enforce a federal right, the decision whether to award prejudgment interest and the rate to be applied if such interest is granted, are matters ordinarily left to the discretion of the district court. *See Gierlinger v. Gleason,* 160 F.3d 858, 874 (2d Cir.1998) (citing *Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.,* 67 F.3d 1063, 1071–72 (2d Cir.1995)); *Securities & Exch. Comm'n v.*

---

6. Courts in this Circuit regularly reduce attorney's fees by 50% for travel time. *See Wilder v. Bernstein,* 975 F.Supp. 276, 283–84 (S.D.N.Y.19978); *Lilly v. County of Orange,*

910 F.Supp. 945, 951 (S.D.N.Y.1996); *Luciano v. Olsten Corp.,* 925 F.Supp. 956, 965 (E.D.N.Y.1996), *aff'd,* 109 F.3d 111 (2d Cir. 1997).

*First Jersey Secs., Inc.*, 101 F.3d 1450, 1476 (2d Cir.1996), *cert. denied*, 522 U.S. 812, 118 S.Ct. 57, 139 L.Ed.2d 21 (1997); *Abou–Khadra v. Mahshie*, 4 F.3d 1071, 1084 (2d Cir.1993); *Orshan v. Macchiarola*, 629 F.Supp. 1014, 1016–17 (E.D.N.Y. 1986). To the extent damages awarded to the plaintiff represent compensation for lost wages, "it is ordinarily an abuse of discretion *not* to include pre-judgment interest." *Gierlinger*, 160 F.3d at 874 (quoting *Saulpaugh v. Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir.1993)) (emphasis in original); *see also Epstein v. Kalvin–Miller Int'l Inc.*, 139 F.Supp.2d 469, 485 (S.D.N.Y.2001) (prejudgment interest on award for back pay recoverable under state law claims).

Here, the Court instructed the jury that Gonzalez was entitled to prejudgment interest and that the Court would make the calculation based on any damage award the jury returned. *See* Tr. at 3312–13. The instruction made specific reference to such interest applying to "money wrongfully withheld from [Gonzalez] from the date she was discharged to the date of judgment." *Id.* Moreover, the Court also advised the jury that any award it made should be determined without reference to the compound interest "on the value of lost income." *Id.* It is clear from these instructions that the prejudgment interest referred to contemplated applying the interest rate only to the value of lost wages, not to any award for emotional pain and suffering.

 Under New York law, prejudgment interest may not be recoverable for damages for personal injury and non-economic losses or for claims which lack an explicit statutory basis. *See, e.g., Schwimmer v. Allstate Ins., Co.*, 176 F.3d 648, 650 (2d Cir.1999); *Love v. State*, 78 N.Y.2d 540, 577 N.Y.S.2d 359, 583 N.E.2d 1296 (1991). To the extent prejudgment interest on such damages may apply to federal claims, the Court elects not to exercise its discretion to grant it in this case. The jury awarded damages for emotional pain and suffering in one sum that did not differentiate between past and future injury. Thus, that recovery presumably represents the jury's assessment of *all* such harm Gonzalez sustained, looking backwards and projecting ahead.

This Court has no basis for assuming that this portion of the verdict is entirely attributable to past injury, or for dividing the emotional damage into past and future components. Insofar as the award may encompass future injuries, prejudgment interest would not apply. *See Gierlinger*, 160 F.3d at 875. Moreover, application of prejudgment interest to imprecise and subjective calculations of loss such as those entailed in emotional suffering not only poses inherent difficulties in computing damages. It also raises fundamental questions of fairness to add interest compensation to elements of loss to which the concept of monetary interest simply does not apply.

Thus, the Court concludes that an award of prejudgment interest on Gonzalez's recovery for emotional injury is not needed in this matter to fully compensate Gonzalez for actual damages, nor is it justified by considerations of fairness and the relative equities of her damages award, nor by the remedial purposes of the statute involved. *See Gierlinger*, 160 F.3d at 874 (quoting *First Jersey Secs.*, 101 F.3d at 1476). Accordingly, the Court will award add prejudgment interest to Gonzalez's award for back pay at the rate of the average of annual interest paid on a one-year United States Treasury bill during each of the past three years.

## VII. *CONCLUSION AND ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that City Defendants' motions for (1) judgment as a matter of law; (2) a new trial; (3) a new trial on damages; and (4) remittitur, are denied; and it is further

**ORDERED** that plaintiff Gonzalez's motion to amend the judgment herein so as to add prejudgment interest on the back pay portion of the verdict is granted, said interest to be calculated on the basis of the rate of the average of annual interest paid on a one-year United States Treasury bill during each of the past three years; and it is further

**ORDERED** that the following individual defendants are directed to pay punitive damages to plaintiff Gonzalez in the amounts indicated: (1) Anthony Kissik: Twenty–Five Thousand Dollars ($25,000.00); (2) Stanley Edelman: Seventy–Five Thousand Dollars ($75,000.00); and (3) Nicholas Witkowich: Ten Thousand Dollars ($10,000.00); and it is further

**ORDERED** that plaintiff Gonzalez's application for reasonable attorney's fees and costs is approved in an amount totaling Eight Hundred Sixty–Seven Thousand Eight Hundred and Nine Dollars and Nine Cents ($867,809.09); and it is finally

**ORDERED** that the parties prepare and settle, within fifteen (15) days from the date of this Order, an Order of Judgment consistent with the provisions of this Decision and Order.

**SO ORDERED.**